## GUSTAVUS E. WAMPLER, and others, *vs.* GEORGE E. WAMPLER, and another, Ex'rs of ABRAHAM WAMPLER.

A legatee under a will may, by a sale and an assignment of his interest, be made a competent witness to establish the will.

The will of a blind man, duly executed and attested, and proved to have been dictated by, and read to, the testator, is entitled to probate, though not read to him by, or in the presence of, the attesting witnesses.

Fraud is not necessary to avoid a will, if improper influence, of a degree which the testator was too weak to resist, depriving him of free agency, and rendering his will other than his free and unconstrained act, can be established.

It is no proof of such undue influence, that the testator excluded some of his relatives upon reasonable grounds given by himself, or that he consulted the objects of his bounty as to the value and disposition of portions of his property.

APPEAL from the Orphans Court of Carroll county.

*Caveat* to the will of Abraham Wampler, which had been previously admitted to probate, filed by the appellants, who were the children of a deceased brother of the testator, alleging that the will was written by one of the executors and legatees; that at the time of its execution, the testator was not of sound and disposing mind, and was and had been for some years before, totally blind; that the will was not read to him in presence of the subscribing witnesses, and was not read to him at all, and that he did not know the contents thereof; that its execution was procured by the fraud, undue influence, and misrepresentation of the appellees and others; and that he was induced, by misrepresentations made for the purpose, to disinherit the appellants, and was prevented, by fraud, force, and duress, from altering the will as he wished to do.

The answer of the appellees denies every injurious allegation of the *caveat,* and avers that every provision and word of the will was expressly dictated by the testator, written down by his direction, first in a rough draft, read over to him, and changed by him as he thought proper as it was proceeded with, then copied and again read over to and approved by him before its execution.

The will was signed by the testator, attested by three witnesses, and in every respect duly executed. By the provisions of this will, he first manumits a negro woman and her children, then gives his surveyor's instruments and notes to his nephew, William A. Wampler. Then follows a bequest of $200 to his niece, Elizabeth Sundergill. He then devised his mill farm and property to his nephew, Airheart Winters, upon condition that he should pay to his executors $3000, and then directs all the residue of his property, real and personal, to be sold by his executors, and the proceeds to go, one-third to his sister, Elizabeth Winters, one-third to his brother, Lewis Wampler, and one-third to the children of his deceased brother, John Wampler. George E. Wampler and Airheart Winters were appointed executors.

The testator was never married, and left as his heirs at law, besides those named in the will, the caveators, who reside in Ohio, and are the children of a deceased brother, Henry C. Wampler, and also the children of a deceased sister. It was admitted that his estate was worth $20,000.

It was proved by the attesting witnesses, who had known the testator for many years, that when called to witness the will, they conversed some time with him, at his request, for the purpose of fully testing his capacity, and found him as capable of executing a will as he ever was in his life; that he had been for many years surveyor, and principal man of business in his neighborhood, and in the habit of preparing most of the deeds and wills for his neighbors; was more than ordinarily acute and intelligent, had been chief judge of the orphans court in his county, and a member of the Legislature. They also proved that a disease of the eyes had, about four years previously, deprived him of sight, and that he was totally blind when the will was executed; that the will was lying on a small table, which was moved to the side of the bed on which the testator was sitting, and that he signed his name to it in his own handwriting, declared it to be his will, and it was immediately signed by the witnesses; that it was not read over to the testator at that time in the presence of the witnesses; and that many of his relatives and friends were present, all of

whom are legatees. The will was dated the 18th of May 1855, and the testator died early in July following, aged about sixty-four years, never having recovered his sight. He kept house, and his sister, Mrs. Winters, lived with him; and Airheart Winters, with his family, lived in another part of the same house.

It was then proved, on the part of the caveators, that Henry C. Wampler, their father, and a brother of the testator, was a physician, and a man of great respectability; that so far as the witness knew, the relations between the testator and the family of Henry, were always very friendly; that Mrs. Leaman was in Carroll county some two or three years ago, and on that occasion visited her uncle, the testator. A letter was then offered in evidence, dated the 19th of September 1853, written by the dictation of the testator to Mrs. Leaman, expressing kind and friendly feelings on the part of the writer towards herself and family. Mrs. Leaman and family were in limited circumstances.

The caveatees then produced William A. Wampler, the son of John Wampler, deceased, and one of the legatees in the will, as a witness, who being sworn on his *voir dire*, stated that he was not now interested in the estate of the testator; that he had sold all his interest therein to George E. Wampler and Airheart Winters, and conveyed the same to them by deed dated the 13th of May 1856, for the consideration of $700—(this deed was offered in evidence;) that the motive of the said parties in purchasing his interest, was to make him a competent witness in this case, and he does not know that he would have sold out but for this desire on their part, but he believes the sum which he received was a full equivalent for his interest in the estate. The caveators then objected to the competency of this witness, but the court overruled the objection, and permitted him to testify, and to this ruling the caveators excepted.

The witness was then examined on the part of the caveatees, and proved that he was present when the will was prepared and written; that it was written by George E. Wampler on the day of its date, at the residence of the testator, and in the chamber usually and then occupied by him; that it was writ-

Wampler *vs.* Wampler.

ten by the request and dictation of the testator, and was read over to him by George E. Wampler after it was prepared, and before it was executed; that a rough draft was first prepared, each clause or item of which was dictated by the testator before it was written down by the said George, and was then read over by him to the testator; that this rough draft was then copied by the said George, and the copy was, immediately after it was finished, read over by the said George to the testator, in the presence and hearing of the witness, and the testator assented thereto, and this copy was afterwards executed by the testator as his will, and is the same identical paper which was read to him by the said George E. Wampler.

Upon cross-examination by the caveators, this witness proved that on the morning of the day on which the will was executed, Airheart Winters informed George E. Wampler and myself that the testator wanted to make a will, and desired us to come out to his house, and we went out immediately; that on the way out, Airheart told George and myself that the testator was that morning very calm and in good condition, that if the will was not made on that day, his disease might afterwards disqualify him; that when I got there, I found him in rather a pleasant mood, perfectly calm and composed, and his mind in a sound condition, in which state he remained during the entire day; that he was lying on the bed when I first saw him; that George E. Wampler and myself entered the room together, and Airheart Winters came in soon after; that the first conversation which took place after I entered the room was this: George E. Wampler spoke first to my uncle, Abraham, who said, immediately, "Where is William?" I then went up and spoke to him; he then said, "Where is Lewis?" (meaning his brother Lewis,) "I wish him to be here;" that Lewis was then sent for; that said Abraham then went on to say, "I want to make a will, and I want you," (meaning the said George E. and myself,) "Airheart Winters and Lewis Wampler to be present; you and George represent your family, Lewis represents himself, and Airheart his mother." I then went myself for said Lewis, and not finding him at home, I eft word for him to come up immediately after his return, and

in an hour or so he came up; there was nothing done until he came. When Lewis came, uncle Abraham told him he designed making a will, and intended giving the mill property to Airheart Winters, on his paying something out, and said, "I want you all to put an estimate on the value of the mill property." I then said to him, "You had better do it yourself, as it will be troublesome for us to arrive at a conclusion," when he said, "No, you are better able to judge of it than I am." That then either Airheart or George E. Wampler proposed that we should go down and try to put an estimate upon it. We, Lewis Wampler, George E. Wampler, Airheart Winters and myself, did then go down and agreed upon an estimate, and returned and told said Abraham that we had estimated the mill property at $7000, to which he assented. After that some one of us said to him, "Now say how much shall Airheart Winters pay out of said property." He refused to put an estimate on Airheart's services, and said, "You all know how long he has lived with me, and what he has done for me, and how much his services are worth." I then remonstrated with him, and said to him, "The property is yours; you know what his services are worth; give him what you please, and we will be satisfied;" when he peremptorily refused, saying, "I will not put an estimate on his services; you may do it yourselves; I want you all to be satisfied; it is yours; I will soon be no more." Then we, the same party, went down stairs; one of us suggested to Airheart to say what he thought he ought to pay out; Airheart then said he thought he ought to have $4000 for his services, and that he was willing to pay out $3000; the rest of us then agreed that he should pay out for the property $3000. We then returned to said Abraham's room, and told him what we had agreed upon, when he gave his assent thereto, and said he was satisfied. Airheart then said to me, "I think he has the other matters all arranged; the difficulty was about the mill property." Then uncle Abraham said, "I want the balance of the estate divided into three parts, one to go to my brother Lewis, one to Mrs. Winters, and one to your family," speaking to myself and George E. Wampler. After this conversation, George E.

Wampler commenced the preparation for writing the will. Then said Abraham spoke of the manumission of the negro woman Belinda and her children. After this George E. Wampler said to him, " What do you intend doing with those folks in Ohio?" (meaning the children of his deceased brother, Henry C. Wampler, who reside in Ohio.) Then he replied, "I don't intend giving them any of my estate; they don't care any thing about me; they only come to see me when there is money or something here for them; I want my estate to go to those who see after me and take care of me." Then he said, "There is Thomas Smith and William Yohn, I don't want them to have any of my estate; they don't come to see me, and don't care any thing about me." Then he said, "There is Betsy Sundergill, I always thought I would give her something; and said, "how would it be if I were to give her the bank stock?" The worth of the bank stock then came in question, when I said it was worth $450; to which he said he thought it was too much to give her; when uncle Lewis said, "Suppose you give her 200." Uncle Abraham then said he thought that would do, and directed George E. Wampler to insert a bequest of $200 to her; and said if she died before him, the money was to revert to his estate. After this George E. Wampler proceeded to prepare the rough draft of the will, according to the dictation and direction of said Abraham, who dictated each item thereof. After it had been proceeded with to the conclusion of the clause appointing executors, I said to him, " What do you intend to do with your surveyor's compass and papers connected with surveying?" He replied, "I can't give them to two of you." George E. Wampler then asked him what two he meant, and whether there was any other surveyor in the family except William? (meaning myself,) when uncle Abraham said, "Lewis' John" (meaning a son of his brother Lewis,) "is learning surveying." When I said to him, that as I had made all his calculations for the last ten or fifteen years, I thought I ought to have at least the papers and compass. He then said, "Well, George, give them to William." Before Uncle Lewis came, there was some conversation in relation to who should be executors;

some one present remarked that he thought Lewis expected to be an executor, when uncle Abraham said that he did not think he would suit as an executor, and he had determined not to appoint him. Lewis lived about a quarter of a mile from the testator, who lived about a mile and a half from Westminster, where George E. Wampler and witness lived; George E. Wampler kept a hotel in Westminster some two or three years before the testator's death, and during the time he, the said testator, was afflicted, he most always stopped with George E. Wampler, when he came to town.

The caveators also proved, by another witness, that one morning, after the testator's death, Airheart Winters said to witness that the testator wanted him to take the tavern stand in Westminster, but Airheart said it would not suit him; that he wanted his uncle either to give him a home or the money with which to buy one.

The court, upon this testimony, passed an order overruling and dismissing the *caveat*, and adjudging the paper to be the last will and testament of Abraham Wampler, deceased. From this order the caveators appealed.

The cause was argued before ECCLESTON, TUCK and MASON, J.

*James Raymond* for the appellants, argued:

1st. That the will is void for all purposes, because, from all the evidence, and the whole record, the conclusion must be, that the paper is the combined result of weakness of mind in the testator, from long continued disease and loss of sight, and the apprehension of speedy death, and of undue influence exercised by the executors, legatees and devisees, in such a way and under such circumstances as left the testator without volition on the subject of the disposal of his estate. If this proposition is true as to the facts it states, the legal conclusion which it draws, that the will is void, will not be questioned. 5 *G. & J.*, 269, *Davis vs. Calvert.* *Starkie's Ev.*, 1701 to 1702. *Hovenden on Fraud*, 266. What then are the facts as proved? No man reading this record can come to any other

conclusion than that, on the day he executed this will, Abraham Wampler was but the *wreck of a man;* that he had not the power of *volition,* but was entirely under the control of the *caveatees.* This is apparent from the testimony of William A. Wampler. It is proved that he was formerly a man remarkably keen and sagacious in business matters; that his judgment was sound, his intelligence above that of his neighbors, his will strong, and his capacity to transact business for himself and others unquestioned. But what does this evidence show him to be when this paper was executed? He had been blind for years, was weak from sickness, and under the apprehension of speedy death. In this state he is surrounded by the appellees. To them his whole estate is given. The caveators, his nephew and niece, equally near and dear to him, but living in a distant State, are *totally cut off.* The law recognises *natural affection,* and when *heirs* are *disinherited* it must be *accounted for,* for such acts are repugnant to our nature. How can it be accounted for in this case? There was no difference or alienation of affection between him and these children of his deceased brother. On the contrary, some year or more prior to his death, he wrote an affectionate letter to his niece, manifesting a deep interest in her welfare and that of her family, and expressing the kindest feelings towards her and them, yet no mention is made of them in his will. The testimony in the case explains this. He was surrounded by these caveatees, who poisoned his mind towards these relatives. Instead of the terms of affection in which they were formerly addressed by the testator, they are contemptuously called by these appellees, "those *folks* in Ohio." The will was *dictated* by the same parties; they valued his property; they told him how to dispose of it; they estimated the services of Airheart Winters; he could not even dispose of his *surveyor's compass and papers* without their dictation. Are these the acts of a keen and sagacious man of business? Can any one suppose that if he had been in the full possession of his mental powers, he would have consulted *others* as to the *value* of his property, and *how* he should *dispose* of it? No; the *animus testandi,* the power to make a will at the time this paper was executed,

had been subdued by the combined circumstances proved by the evidence, and if this will can stand, who that is not willing to hang round the dying bed of his rich relative can hope to avoid the fate of these appellants?

2nd. Was the will "attested and subscribed in the presence of the devisor by witnesses," within the meaning of the act of 1798, ch. 101? Our courts have said that *presence* means where the testator can *see* the witnesses sign if he will. By this construction the act has certainly not been complied with, for the testator was *blind*. Should the court, however, say that it was neither the intention of the act to require impossibilities, nor to deprive the blind of the power of devising real estate, we think it but reasonable that it should insist upon as near a compliance with the act as possible. The substance of the law should be gratified, by having the testimony of the *subscribing witnesses* to the fact that the testator could not have been imposed upon as *to the paper* he signed for a will, and this should have been done by having the paper read to him in *their presence*. This *all important fact* now rests on the testimony of but *one* witness, and he a legatee under the will, who had sold out his interest for the express and avowed purpose of becoming a witness. Such a party, we say, is not a competent witness. But if he is, the law provides that the testator shall see three witnesses put their names to the paper which has been signed for a will, as the best means in ordinary cases of guarding him against the imposition of signing a false paper, and yet in this case this fact is proved by only one witness, thus leaving the blind more exposed to fraud and imposition than those who can see. If William A. Wampler's testimony be necessary for any purpose, that necessity requires two more witnesses. In case of sight, *three* witnesses, whom the testator *saw subscribe,* must prove there was no imposition by false papers. Blindness may by necessity dispense with the circumstance of "*subscribing in sight* of the testator," but there the necessity ends. The *three witnesses* must be satisfied that the paper is genuine. Where the testator can see, the law permits them to be satisfied without reading the will to him. Does it so permit when he cannot see? The *court* must be

satisfied there was no imposition. Where there is sight this is presumed, if three witnesses subscribe in the testator's presence. Is it a legal presumption in blindness? There are many guards against a false paper where there is sight, which do not exist in blindness, even if the testator can neither read nor write; the size of the paper, its color, place of beginning and ending, &c. He that can see, without being able to read or write, has many means of detecting a false paper of which the blind are deprived. Some of the books say, three witnesses are required to subscribe to prevent combination among the witnesses to practice fraud. If this be the reason, should there not be three to the reading of the will where the testator is blind? Nothing but necessity can allow the law to be relaxed as to *actual* power to see the witnesses subscribe. Will the court relax the law beyond the necessity? *Williams on Exc'rs, Vol.* 1, *page* 17, says, that in the case of the will of a blind man, "it seems best that it be read over to the testator and approved by him, in the presence of all the subscribing witnesses; and this the civil law did expressly require. But in England this strictness seems not to be precisely requisite, if there shall be other *satisfactory* proof before the court of his knowledge of the contents of the *identical* will."

*William P. Maulsby* for the appellee, argued:

1st. That the law does not require that the will of a blind man should be read to him, before execution, in the presence of the attesting witnesses, or indeed at all; that in this case, as in all others, proof of execution, according to the terms of the statute, satisfies the law and raises the presumption of knowledge of the contents of the will; that blindness is but one circumstance which may or may not fortify other facts and circumstances proved to sustain the allegation of fraud, but that, standing by itself, it is not a fact from which fraud can be inferred. 5 *Phillips on Ev., Appendix,* 295, and cases there collected. 5 *Bos. & Pul.,* 415, *Longchamp vs. Fish.* 2 *Dev.,* 291, *Hemphill vs. Hemphill.* 1 *Dev. & Bat.,* 82, *Downey vs. Murphy.* 3 *Leigh,* 32, *Boyd vs. Cook.* And if the law does require proof that the will was read to the testator,

the proof in this case is clear that it was so read to him and that he knew its contents. William A. Wampler is clearly a competent witness. 7 *G. & J.*, 311, *Deakins vs. Hollis.* But concede that he was incompetent, then the *presumption* of law arises that the testator *knew* the contents of the will. The *onus* is on the caveators to show the want of such knowledge. 3 *Md. Rep.*, 491, *Cramer vs. Crumbaugh.*

2nd. That there is no proof in this record of *undue influence.* William A. Wampler is unimpeached, and is a man of unimpeachable character. He proves that the paper was carefully prepared in each part and clause at the express dictation of the testator, and that the rough draft was read to and approved by him, and then copied, and again read to and approved by him, and that the *identical* paper, so read and approved, was signed by the testator and attested by the subscribing witnesses. I leave this part of the case to remain where it is, on his testimony as it appears in the record, *confident* that there is nothing in it to sustain the *preconceived theory* of the existence of such undue influence.

Tuck, J., delivered the opinion of this court.

We are of opinion that the evidence of William A. Wampler was properly received by the court below, and must be regarded by us in the decision of this appeal. *Deakins vs. Hollis*, 7 *G. & J.*, 311.

The record presents the case of a blind man's will, executed in due form of law, and attested by three subscribing witnesses. The will was not read to the testator by or in the presence of these witnesses; but, as proved by the above named witness, it had been dictated by the testator, prepared accordingly, and afterwards read to him, on the day of its execution, before the arrival of the attesting witnesses. The case thus stated relieves us from the necessity of pronouncing upon the validity of a will executed by a blind man, it not appearing that the will had ever been read to him.

Whatever the doctrine was, as laid down by the earlier writers, we take it to be well settled at this time, that a last will and testament, such as the one under consideration, is

entitled to probate. And, indeed, we understood the counsel for the appellants as conceding that, on this point, the authorities are against him. The subject is so fully discussed in the cases cited on the part of the appellees, that we may content ourselves with referring to them, and especially to *Longchamp vs. Fish*, 5 *Bos. & Pul. N. R.*, 415, which is much like the present. See *Godolph. Pt.* 1*st, ch.* 11. *Richardson's Law of Testaments & Wills*, 45. *Lovelass on Wills*, 264. (25 *Law Lib.*)

It is contended, however, that the testimony of William A. Wampler shows that this will was prepared and executed under circumstances which, in connection with the sickness and infirmity of the testator, raise a proper ground for rejecting the instrument, as the act of a party performed while under the undue and improper influence of those around him at the time. Fraud is not charged in the argument, but, as was held in *Davis vs. Calvert*, 5 *G. & J.*, 269, this is not necessary to avoid a will, if improper influence can be established. In the case referred to, we are told what kind and degree of influence is necessary. Now, testing the present will by that rule, we do not perceive that there is sufficient reason shown for rejecting it.

It is worthy of remark, that the witness is unimpeached and uncontradicted as to a single fact to which he speaks, and the provisions of the will are not such as to raise any doubt that all was done fairly and in accordance with the intention of the testator. He appears to have acted as a person of free will, in directing what he wished done. His reasons for excluding the appellants, and some others of his relatives, as given by himself at the time, are not unreasonable, and if the fact of their not having visited or cared for him, had been otherwise than as stated, we suppose some evidence on that point might have been adduced. The mode of estimating his property so as to determine the amount to be charged thereon, was suggested by him, and persisted in, although the persons present expressed a desire that he should make the valuation and name the amount himself. The executors were named by him, to the exclusion of his brother, who he was told might

desire the office, because, as he said, it would not suit him. The facts concerning the surveyor's instruments, show that his mind was in doubt as to which of two nephews should have them; but, when a reason was suggested for bequeathing them as he did, he so directed. It is no uncommon circumstance for a person to hesitate how he will dispose of his property, or of certain portions of it, and to advise with others as to its value, with a view to making his will; and certainly there can be no objection to his gratifying what he may suppose to be the wishes and feelings of the objects of his bounty. He is represented to have been, before his sickness, a man of great force of mind and capacity for business, and to have been much employed in drawing deeds and wills for his neighbors. There was no evidence to show how far (if at all) his mind had been affected by disease; but, on the contrary, the subscribing witnesses stated that they had known him for many years, and that, at the *factum* of the will, he was as capable as they had ever known him to be.

The case does not show that the imputed influence and importunity, if any existed, was of a degree which the testator was too weak to resist, depriving him of his free agency, and rendering his will other than his free and unconstrained act. *5 G. & J.*, 302.

*Order affirmed with costs.*