## Morrison *vs.* Smith.

### *In the matter of the proving of the last Will and Testament of* John Morrison, *deceased.*

THE decedent, a short time after the execution of his will, was committed to the Lunatic Asylum, at the instance of his family, after an examination by a physician, who found him insane, and laboring under a delusion that some of his children were spurious. He was exceedingly cautious on the subject of the delusion, and careful not to betray it to the examining physician, until the latter succeeded in gaining his confidence. He had been melancholy for a length of time, and his depression of spirits had been greatly increased by the recent decease of his wife. Within a few days of the date of the execution of the will, he had become suddenly violent at night, to such an extent as to require physical restraint, and about the same time he gave indications of the delusion in respect to his children.—*Held,* that a will, made very near the time of these developments, unequal in its provisions, and favoring the only two members of the family privy to it, one of whom was present when the instructions were given, when the draft was submitted and when the instrument was signed, and both of whom had been the decedent's agents, and had possession of his estate,—needed more than the formal proof of the *factum,* and the evidence failing to show affirmatively the soundness of the decedent's mind at the time of the transaction, probate was denied.

JAMES G. McADAM, *for the Executors.*

As to the facts.—In this case it is attempted to be proved, that the decedent was not competent to make a will, at the date of making the will offered for probate. On the hearing, the two witnesses to the will, showed that he was perfectly sound in his mind when the will was made. The date of making the will was placed in a little doubt, by reason of the day of the month being accidentally left out, and the witnesses stating it to have been made about the middle of January. This fact as to the date, was corrected by the production of the receipt for drawing the will, and McAdam's testimony in reference thereto, showing that the will was executed on

the 4th or 5th of January, 1853. The fact of the perfect sanity of the testator is confirmed, and substantiated by the testimony of Dr. Gray, Dr. Kelly, Mr. Purdy, and Rev. Mr. Evans. The testimony of Dr. Hart, who is claimed as the great authority for the insanity of the testator, presents Mr. Morrison, as one of the most perfect-minded men—the keenest, clearest, shrewdest man that ever was presented as a lunatic. I refer to his testimony *specially.* Clear his testimony of what he heard, what he concluded, and what he reasoned, and give us the calm view he presented of Mr. Morrison, and his indubitable proofs of insanity vanish into fog.— We call the special attention of the court to the fact, that the theory of the opposition to the will is, that the death of Mrs. Morrison upset the testator's mind, and that from that date, to wit, the 20th December, he was out of his mind : and the whole of their testimony begins from the 21st of January. While for the purpose of strict truth and the character of the testator, I deny that he ever was insane ; yet, for the purpose of this litigation, I admit that from the 21st of January, he might have been unfit to make a will. But the will was made on the 5th of January, fifteen days anterior ; therefore the testimony against the will is too late, and does not in any way apply to the case. A great deal has been said about throwing a pitcher at his daughter, and the breaking of a clock—as if these were facts patented to prove insanity ; or as if they were facts which could transpire only once in the life-time of a man or a clock,—or as if they were facts which parties could not be mistaken as to the time they heard them spoken about. Dr. Kelly says, the reason he examined Mr. Morrison as to his sanity, on the 6th January, was his daughter's stating that something had been thrown in her face by her father. Now the doctor may have been mistaken as to the time when he was told about the throwing something at her. But certainly whether that was a fact then stated or not—it is not a fact on which to predicate insanity. And when he afterwards examined him, and found him perfectly competent and sane, it dispels the doubt.

I. Sanity is presumed till the contrary is shown, and the proof of insanity lies on him who alleges it. (*Jackson* v. *Van Dusen,* 5 *John. Rep.* 153 *and* 159.) Imbecility of mind in a testator, will not avoid his last will and testament. (*Stewart's Exec'r* v. *Lispenard,* 26 *Wend.,* 255; *Odell* v. *Buck,* 21 *Wend.* 143.) In this case, if any thing is shown, it cannot go beyond imbecility. A person may be capable, and his capacity perfect to dispose of property by will, yet inadequate for the management of other business. (26 *Wend.* 255.) The parties opposing this will claim that because the deceased did not attend to his ordinary business, therefore he could not dispose of his own property.

II. The right of testamentary disposition is regarded as a common and natural right, to be restricted no further than public policy and the necessary evidence of interest and consent absolutely require. (1 *Hagg. R.,* 385; 3 *Wash. R.,* 587; 4 *Wash. R.,* 261.)

III. On a question of sanity, the contents of the will and the situation of the testator are proper subjects of consideration by a jury or court. In this case the testator was at home. The beneficiaries in the will, at least the executors, did not reside with him, but away from him. (*Clarke and wife* v. *Vorce,* 19 *Wend.* 232.) The mere fact of a person having been sent to a lunatic asylum, is not sufficient to prove insanity, even though he be a resident at the time of its execution. (*McAdam* v. *Walker,* 1 *Dowes' Par. Rep.,* 178.)

The small amount of the property, $5,000, forbids the idea of any great inducement to fraud. The reason of putting certain shares in trust, being so perfect:—Margaret being really not able to take care of herself as fully as her father might have wished, as admitted by opposing counsel; and, Mrs. Smith being married a second time to a widower, with children of his own, explains fully the reason of the distinction being made, and justifies the will.

And lastly, the fact that he lived a long while after he was

discharged sound and in his right mind, at the house of Smith : and

The fact that he made no other will, show that he considered the one he had made just right ; and it is a very strong, though very silent affirmation of the will.

SWEENY & SHEA, *for Contestants.*

I. The paper writing propounded must have been executed after the scene of violence on the part of the decedent, when he exhibited admittedly, indications of insanity, fixed by the burden of the testimony, and, in fact, the concessions of the parties propounding, as having been from the 8th to the 10th of January, 1853.

II. The decedent, at the time of the execution of the paper writing, was not, in the language of the statute, of "sound mind and memory." The violation of decorum involved in the proposition by or on behalf of the persons who caused the decedent to be, on the 21st of January, 1853, incarcerated as of unsound mind, in a Lunatic Asylum, that the decedent never was insane, is so gross that the contestants decline being parties to the indecorum, by discussing *that* point in the propounders' case.

The propounders contend that he was " imbecile," and refer to *Stewart's Executors against Lispenard.* If ever there were a case reported that clearly developed the theory upon which it was decided, it is that very case of *Stewart* vs. *Lispenard.* That case proceeds upon the plain distinction between a " *sound*" and an " *unsound*" mind, *i. e.*, between a healthy, (however weak), and a diseased mind. In that case the testatrix was, from infancy, constitutionally of notorious *weakness* of mind, to such an extreme as to amount to imbecility, but, though *weak*, her mind was *undiseased.* There is not in the whole mass of evidence taken in that case, an intimation of the existence of any delusion in the mind of

Alice Lispenard; her mind, though weak, worked naturally. How different is the present case! A man of a high order of mind is found, at a period, late in life, laboring under a delusion, utterly inconsistent with rationality; characterized, too, still more distinctly by an utter abandonment of all his previous and strongly fixed business habits and pursuits. The propounders argue that he was "imbecile," if so, his mind was not then in its normal condition, as was the mind of Alice Lispenard; his *falling* into that state is an unquestionable evidence of *disease* and *of unsoundness of mind.* Now, what is the evidence as to how long before his committal to the Asylum, he was in an unsound state of mind? It is so undisguiseably a work of supererogation to argue that branch of the case at any length, that we shall conclude our remarks upon it, by referring to the evidence of Dr. Brown, of Bloomingdale, of Jackson Bumstead, of Otho Oliver, and several others of the witnesses, all of whom testify to statements made by the propounders themselves and members of the family, that decedent had been in that state for various periods, ranging from the date of his wife's death, one month previous, to a space of five months anterior to his committal to the Asylum.

Dr. Brown's evidence seems to be conclusive on that point. In this connection consider the attempt to commit suicide many years before any of these occurrences, and the decedent's statement to Dr. Hart that he had been for a year or more under the impression (delusion,) as to the spuriousness of his children. The very case of *Stewart against Lispenard,* frequently in the various opinions delivered, recognizes that the law will not measure the particular degree of affection of the mind. In the present case, the delusion under which the decedent labored *directly* operated upon the disposition he would make of his property. He was about distributing his property among his children, and any delusion in relation to them would naturally and consequentially operate upon the manner of the disposal thereof; if there was any ratiocination in relation to the disposition of his property at all.

Upon a view of the whole of the arguments, presented on behalf of the propounders, we are impelled to wonder why among their other desperate efforts to demonstrate the decedent's sanity, they have not contended that the delusion as to his children was no delusion at all, and that his impressions as to the spuriousness of his children were well founded in fact, and were the conclusions of a reasoning and rational man; they having seemingly forgotten that strong point in their behalf, we throw out the suggestion for the benefit of whom it may concern.

III. The acquiescence of the deceased in the existence of the paper propounded, argued by the counsel for the propounders, being after the time at which he was discharged from the asylum, evidenced as is claimed by his non-revocation of the same, has no bearing, and is scarce worthy of consideration for the reasons:

1st. That at the time of signing, or executing, the decedent was not capable in law of making a will, and any such alleged acquiescence could only be effective as a re-execution, and in that view it is inoperative in not complying with the requisitions of the statute.

2d. The propounders allege (having in view, no doubt, the case of *Stewart against Lispenard*), that the proof shows the decedent to have been merely "*imbecile.*" Without here referring to the evidence that they themselves adduced, of the high character of his intellect testified to as existing up to and on the 21st day of January, when he was sent to the Lunatic Asylum, as utterly refuting the theory of his being " imbecile," the contestants may not unfairly so far use the propounders' assertions and arguments as to urge the proposition that if he were " imbecile" at that time, he could not retain any recollection of the act of executing the will, when recovered from that condition, which is a full answer to the plea of acquiescence. And, in this connection, let us take in view the fact that all the evidence shows that the will from

the time of its execution to its propounding, never left the possession of William Morrison, one of the propounders, and was never afterward alluded to by, or brought to the knowledge or recollection of the decedent.

IV. There is much in this case, that, in attempting properly to characterize, one would be prone so decidedly to express his convictions, as to run into harshness of epithet, or at least censorial stricture upon the good faith of the whole transaction. We have guardedly put forth our views, that we might not, in terms, impeach the rectitude of any, and more especially of the dead.

In every view of the case, then, whatever conclusion on the facts may be arrived at, it is unquestionably the case that if the instrument propounded be not admitted to probate, the statute law will work equity between all the parties justly interested, it being generally, and, in this instance the case, that the devisement of one man's mind, can effect but little improvement upon the recognized justness of distribution of the intestate's estate provided by our statute law.

There is another inducement to leave the distribution of this particular estate to the operation of our statute, which is that the administrator, this so-called will being disallowed, must give ample security, by the means of which the rights of all, who are, in nature, entitled to any share of the decedent's estate, will be fully protected. The propounders here were by their own avowal, during his life time, including the period of his incarceration in the lunatic asylum, in possession of, controlling and managing all the decedent's estate —let them, or the survivor of them be held liable to render to an administrator an account of their stewardship.

Further, in conclusion, the survivor of the propounders, has, under his oath, (making up his account after his own fashion, allowing and disallowing items at his own pleasure, without entering into particulars, without giving the contestants an opportunity for cross examination,) alleged that the value of the decedent's estate does not exceed five thousand

dollars.   Take it to be thus,—read the provisions of the will, and all that portion bequeathed in trust to the contestant Martha, is ascertained to be so paltry, as *in that shape* to be of no use or benefit to her soever.   And who are the trustees? The very stewards of the decedent's estate, the propounders, who in this litigation claimed that they had acted during decedent's lifetime in his affairs, under written power of attorney which they never ventured to produce, and who proffered a witness (the daughter Margaret,) whom they themselves admit they knew to be of not entirely sound mind, (does not the fact of her being of unsound mind bear upon the question of her father's sanity?) who have never yet rendered, nor been placed in a position where the contestants could compel them to render an account.   The trust effects, in fact, a bequest to them, of all the decedent's property, charged with certain pittances to the decedent's own children, of the amount, the regularity, and the time of payment of which those same stewards, the propounders, are to be the sole and irresponsible arbiters.

The will should not be admitted to probate on the ground of the incapacity of the decedent.


THE SURROGATE.—The decedent's will is contested by Mrs. Smith, one of his daughters.  The property is sworn at $5000. By the terms of the will five hundred dollars are given to each of the executors and to the decedent's daughter Margaret, and the residue is divided equally among his six children.  The shares of Margaret, Martha, and Catharine are given to the executors in trust to invest and pay them the interest,—and on their decease without issue the shares to go to the other children,—in case of their dying leaving issue, the issue to take the share of the parent.

This will is contested on the ground that the decedent was insane at the time of its execution.   The counsel who prepared the instrument had three interviews with the decedent

at his residence, at the first of which he received his instructions, at the second submitted the draft, and at the third produced the will for execution. "The instructions," he says, "were given in the afternoon, and the draft was taken the next day : a day or two after, the engrossed copy being prepared, was taken and executed." At each of these interviews William Morrison, the decedent's brother, and one of the executors, was present, and when the instructions were given, talked with the decedent "about some parts of the will." William Morrison, and John M. Morrison the other executor and a son of, the decedent, had had the management of the decedent's business for some time, but for how long a period and in what manner I do not exactly understand, though it is stated in evidence that they had closed it up in May, 1852. The decedent had been in ill health several months before the will was executed, and after the decease of his wife, December 20, 1852, his malady assumed a more serious form. Mr. McAdam says : "I received an intimation that he might not live long, but do not know from whom I got the idea." "He was complaining as to his health at that time. I understood he had been confined some time to the house." As to the time the will was executed, it is left in some uncertainty. The counsel who drew the will states that "the date was left blank in order to be filled in the day the will was executed. It was forgotten to fill up the blank." On his first direct examination, he testified that the time of the execution was "about the middle of January, 1853." Mr. Orr, the other subscribing witness, also said : "I think the will was executed about the middle of January." This agreement as to the date would seem quite convincing were it not for other circumstances to which I shall hereafter advert, which are urged for the purpose of establishing a prior date.

The decedent was committed to the Lunatic Asylum at Bloomingdale on the 21st of January, 1853, on the affidavits of Dr. Edward Gray and Dr. John Hart. Dr. Hart says he was introduced to the decedent on the 21st of January. "He was represented to me to be insane by Dr. Gray, his attend-

ing physician." "It was represented to me that he was pretty wily, and for that reason I was not introduced as a physician, but simply as Mr. Hart." The doctor conversed with the decedent, "found him exceedingly cautious," and perceived no indication of insanity. Being "completely foiled," he withdrew and "conferred with his children to ascertain the leading points of his insanity—the direction in which his mind wandered." He learned that "he was in a state of delusion as to his children—that some of them were not his, but were palmed upon him as his, but he thought they were spurious;" with this information he returned and made another trial. He says: "I touched upon that point on my return, and he became excited, and demanded my right to question him on that subject." The doctor finally gained his confidence, and he adds, "he then gave me an indubitable evidence of his insanity, by denying part of his own children, stating that some of them were his, and some of them were not." Dr. Hart came to the conclusion that he was insane on that point, and he also thought there were other indications of insanity besides. He says: "The family wished him removed, and stated that he had been violent and attempted to injure himself, and that he was unsafe to be at large." The effect of the delusion is thus stated by the doctor: "those he regarded as his children he was fond of, and those he did not so regard he was not attached to. That was my general impression. He spoke simply of his children— some were his and some were not. Some he acknowledged and some he repudiated. He was very excited, particularly when I questioned him on his family."

Dr. Gray, the decedent's family physician, testified that he had been attending him some time previous to the 21st of January. His last visit on the decedent's wife was December 20, when she died. He visited the decedent himself January 4th, at the request of his son John. He found him complaining of great debility, want of proper circulation, numbness in the fingers, and "disagreeable feelings." The doctor visited the decedent again at the request of his son John, on the suc-

ceeding Saturday, the 8th of January. On his first examination he seems to have confounded this visit with the one made on the fourth, for he said : "On the Saturday I first saw him he seemed to be melancholy, but nothing unusual, for he had been so for a length of time. I thought he seemed to be a little more melancholy. He seemed to be melancholy, which I attributed to the death of his wife. At the same time, as far as I can remember, he seemed to me to be perfectly rational." On being further questioned on this point, the doctor said : "The first I ever doubted his sanity was the Saturday of my first visit, if I did have one then." "I don't know that I could affirm that he was of his usual sound mind on the Saturday of my first visit, nor can I affirm the contrary. I don't think his mind was in as healthy a condition as it was before. He seemed to be more gloomy, dispirited, melancholy and depressed." It does not transpire what occurred on the visit made on the 8th. On the morning of the 10th the doctor was informed the decedent had suddenly become violent during the night, had thrown a clock at his daughter, thrown up the window and shouted out into the street. He says, he was "calm enough," but his daughter Margaret stated that he had denied she was his daughter, and Dr. Gray adds : "If I remember well, I think he said something to me of the same kind—that she was not his daughter Margaret." The doctor continued to visit him once or twice a day, and gave directions that he should be watched, to prevent violence. "The delusion in regard to his daughter Margaret continued on * * and also in regard to his son Joseph, he thought he was not his son Joseph, but some other person substituted for him." "I remember once his saying to Margaret when she came into his room, that she was not his daughter. For one day he seemed to me to be more insane than at other times. I judged this not by acts, but from the general expression of his countenance and manner. The expression of his countenance denoted that his intellect was as if obliterated for the time being. On the next day, or very shortly after, that was altogether gone—that expression of

countenance." "I think he was altogether of a nervous temperament, and I think his insanity was produced a good deal by his habits of living, also from loss of his wife. That I should think, would have a great influence upon a man of his mind at that time. He was also a man of great study, very superior intellect and depth of mind, so far as I could judge. From the history of his life, so far as I could gather, religious ideas were a great cause of his nervous excitement, and I think, though his reason may have convinced him that his views were correct and reasonable, that he was not altogether satisfied—that he was not happy." The events of the night of the 9th of January do not rest upon the declarations of the decedent's daughter. The noise appears to have attracted the attention of the police; an officer went into the house, and entered the decedent's room. As he opened the door a pitcher was thrown at him, but he succeeded in mastering the maniac. This officer testifies that "at the same time there was a clock stood on a kind of desk or bureau, which fell down and was broken." Another witness states "the old gentleman said they wanted to murder him—poison him —they were after his money." It also appears that his daughter Margaret's head was cut that night.

Dr. Brown, the Superintendent of the Asylum, testified that the decedent was confined there about eighteen months. His case was *melancholia*, a form of disease "which does not ordinarily supervene with a violent paroxysm." He says: "I got a history of the case from some of the members of the family who accompanied the decedent to the Asylum. I think Mr. John M. Morrison was then present. Where there are several belonging to the family, my custom is to interrogate them all, with a view to arrive at the facts. I find that my memorandum of the case runs in this way:—"That the decedent was supposed to have inherited no predisposition to insanity—that in the year 1842 he had an attack of mental depression corresponding somewhat to his then present state— that his present state of mind had existed about five months, and may have been noticed, perhaps, before—that it was sup-

posed to arise from pecuniary and business embarrassments and anxieties, and losses which were comparatively trifling— that the despondency was aggravated by the death of his wife in December previous to his admission—that he had been very low-spirited with alternations of excitement and noise at night—that he disavowed the identity of his children— and that he was supposed to indulge suicidal propensities."

The testimony to establish rationality is given by several witnesses. Mr. Purdie, saw him two or three times after his wife's death and before he went to the asylum, once he thinks soon after New-Year's day. He observed nothing to excite suspicion, and did not think that he appeared " to be in a state of despondency." The Rev. Benjamin Evans called on the decedent, and conversed with him three times after his wife's death. The first visit was probably on the 4th or 5th of January. The decedent took his usual part in the conversation, and manifested nothing to attract attention—nor any " irrational despondency." The next visit was after the 9th of January, and no " irrationality" was betrayed. The next interview was on the 16th, and the result was the same. Besides this evidence, we have the opinions of the subscribing witnesses to the will, and of the two physicians, Drs. Gray and Kelley. Dr. Gray gave the following certificate:—

" This certifies that I have been acquainted for some years past with Mr. John Morrison, sen., of 50½ Eldridge Street; during which time, I always considered Mr. Morrison to be in a sound state of mind and capable of directing his affairs. Mr. Morrison has suffered a great deal of sickness for the last two years, especially of a nervous character, yet everything duly considered, I give my opinion as above.

E. GRAY, M. D., Surgeon, &c.

*January 7th,* 1853."

The Doctor states, that John M. Morrison applied to him for this certificate several days before its date. He appears to have visited the decedent on the 4th of January, and I think

it probable the request to furnish such a certificate was the occa-
sion of that call, although the doctor says, he does not remem-
ber what the object of the visit was. He handed the certifi-
cate to John on the 8th, and was then again asked by him to
call on his father.

Dr. Kelley gave the following certificate:—

"NEW YORK, *January* 6, 1853.

This is to certify that I, J. Wesley Kelley, Physician, of
the city and county of New York, have carefully examined
Mr. John Morrison, of 50½ Eldridge Street, New York city,
in relation to the state of his mind—do declare that the said
John Morrison is of sound mind and intellect, and in full pos-
session of all the faculties of reason and intelligence.

J. WESLEY KELLEY, Physician."

Dr. Kelley testified, that John M. Morrison requested him
to call on his father, October 19, 1852, to examine and pre-
scribe for him: he did so, and made three visits subsequently,
one of them at the request of John. He says, that on the 6th
of January, the date of the above certificate, John asked him
to go, but did not request him to examine into his father's
mental condition, and the subject of the certificate was not
mentioned until afterwards; and yet the doctor "examined
him, and paid particular attention to the state of his mind."
He states, "I came to examine the decedent's state of mind,
from an intimation I had from the daughter of the deceased,
Margaret; she said her father at one time threw a pitcher at
her head, or something of that kind. His age also induced
me, the inflammatory condition of his blood, also the quick-
ness of his pulse."

Upon these facts the question is, have the proponents esta-
blished their case? Here is a will, which gives one-fifth of the
small estate to the executors, one, if not both of whom, was
concerned in the transaction, and both of whom had been
managers of the decedent's affairs for some time previous.
One of them, William Morrison, is present at every stage of

the affair; and though it does not appear that he interfered in the presence of the draftsman, yet the inquiry naturally arises, why was he there at all, if the decedent was entirely competent to transact his own business.  William Morrison was present when the instructions were given, the next day when the draft was read, and again when the will was executed.  William Morrison it was that requested Mr. Orr, the partner of John the other executor, to attend as a subscribing witness; and William Morrison it was, that took away the instrument after execution, and produced it to be read to the family after the decedent's death.  There is not a particle of proof that any of the decedent's children knew a will had been executed, unless it might be John.  It was John that directed Dr. Gray to visit his father, and requested a certificate as to the state of his mind: and it was at his instance Dr. Kelley made a similar visit and gave a similar certificate. Mr. McAdam's receipt for the charge for drawing the will, acknowledges payment from "William and John M. Morrison."

That the decedent was insane on the 21st of January, when he was committed to the asylum, does not admit of a shadow of doubt.  Least of all are these executors in a condition to question it, for they were consenting, if not participating in the act of placing him in that institution.  Nor was his a case of monomania only—for such symptoms as melancholy, nervousness, gloomy solitary habits, violence, and apprehension of being murdered and deprived of his property, establish very clearly general insanity.  The events which occurred on the night of the 9th of January, picture a raving maniac. Very likely prior to that time, the condition of his mind had not been so plainly indicated, but if there had been no suspicions in regard to it, why did his son John particularly request the family physician to visit him, and why did he call in Dr. Kelley, and then obtain from each a certificate as to his father's sanity?  It is not a usual thing to procure such certificates, and I must therefore presume there was some ground for suspecting the decedent's capacity.  If so, why

was it not communicated to the examining physicians? But no, they were both sent there separately, without an intimation of the kind, and then are requested for certificates without such a special examination as a certificate of that character justly calls for. But by accident it seems that Dr. Kelley did examine the state of the decedent's mind on the 6th of January, and was led to it "from an intimation" from Margaret Morrison, who said "her father had thrown a pitcher at her head, or something of that kind." Now this act of violence must have occurred on the 9th of January, or before the 6th. On the former hypothesis, the Doctor's certificate is misdated—on the latter, an indication of insanity is evinced before the 6th. It detracts much from the examination made by these gentlemen that they were not specially directed to the features of the case. They were sent to visit as physicians, and were then called upon to certify to soundness of mind. That to find out the delusion existing in the decedent's mind relative to his children, it was necessary to possess the clue, is apparent from Dr. Hart's testimony. He expresses the opinion that the decedent "was sensible himself of his infirmity." This is a common phenomenon attending mental derangement, and there are cases on record where the subject has for a length of time defied every effort to make him convict himself of irrationality, and yet, when the key was discovered, instantaneously disclosed his delusions. So here the decedent's caution and craftiness were more than a match for the physician's experience and shrewdness, until the secret spring was found and touched, and then he laid bare his mind. From the fact that there was no very great violence, Dr. Hart inferred the disease to be of a chronic character, and he stated in addition, that the decedent himself made some observations "as to the length of time he had been under the impression in regard to the children." The Doctor says, "my impression is that he stated they had been several months or a year making these attempts upon him." True, no reliance can be placed on this statement of an insane subject, but it is corroborated by the me-

morandum of the case made by the superintendent of the asylum, as obtained from the members of the family. But to return to the certificates, their very existence suggests a doubt, and if doubts existed, the failure frankly to communicate them to the physicians raises a strong suspicion. As to the witnesses adduced to prove the rationality of the decedent, their attention was not directed to any special examination of the case. How little reliance can be placed upon casual observation, is illustrated by the fact that even after the ninth of January, and when the decedent was undoubtedly insane, the Rev. Mr. Evans spent some time in conversation with him, without discovering any symptoms of derangement. Now let us look at the general features of the case. Here was an intelligent man of nervous temperament and great mental activity, whose mind had been considerably agitated on the subject of religion, who had withdrawn himself from his business, for several months been confined to his house, and addicted to habits of solitude. His wife dies, and grief is superadded to other disturbing causes. He denies his children as genuine, says that attempts are made to murder and poison him, breaks out into acts of open violence, assaults a daughter who, he alleged, was spurious, and yet, when examined by a physician sent for that purpose, is cunning enough to foil his every effort to detect insanity. A will is made very near the time of the development of these latter symptoms; the legatees of one fifth of the estate were privy to it; one of them was busy in sending medical gentlemen to visit the decedent without special instructions, for the purpose of procuring certificates of sanity; the other was present at every one of three interviews between the decedent and the lawyer in respect to the will; both of them had been the decedent's agents and had possession of his estate. No sign appears of the other members of the family being made acquainted with the execution of the instrument. The decedent is soon after confined to an asylum, whence, after remaining eighteen months, he returns to live with the daughter who contests the will, and down to the time of his death,

it does not appear that he ever spoke of or subsequently re-
cognized the existence of the will. Such circumstances seem
to me quite sufficient ground for the rejection of this instru-
ment. The proponents are bound to make out satisfactorily
the soundness of the decedent's mind, and I must say they
have failed in convincing me. Their connection with the
transaction, in conjunction with the fact that they were his
agents and take legacies under the will, is enough to reverse
the usual order of proof and to raise a presumption which
they are bound to disprove. The date of the will being left
blank, adds still another complication which has been the
subject of comment, but I am not prepared to say that the
precise date is of much importance. Both the subscribing
witnesses in the first instance placed it, from recollection,
about the middle of January; one of them, however, subse-
quently corrected his recollection by referring to a receipt
produced for the fee for drawing the will, which bore date
January 7, 1853, and which he thought was given two or
three days after the will was executed. This would carry
back the time of execution to the 4th or 5th of January, and
the giving of the instructions to the first and second of that
month. That would not alter my view of the case. It is on
the proponents to establish the validity of this will. The de-
cedent's abandonment of his business, his solitary habits,
general state of melancholy and depression of spirits, the loss
of his wife, the delusion as to his children, and the insane
outbreaks on the 9th and the 21st of January, connected with
the failure to make any special examination into his condi-
tion until he was sent to the asylum—the privity of the lead-
ing beneficiaries to the transaction, their fiduciary relations
towards the decedent, and the failure of any proof of subse-
quent recognition of the existence of the will, after the dece-
dent was discharged from the asylum—all these are circum-
stances which throw upon the proponents the necessity of
positive, clear, and direct proof of the possession of a sound
and disposing mind and memory by the decedent, when he
signed this paper. The particular delusion with which his

mind was captivated, was cunningly concealed, and could only be exposed by touching upon the subject. This form of his malady may have been, and probably was, lurking in his mind before it reached full development. The obtaining of the certificates as to his condition on the 6th and 7th of January, satisfies me that some reason already existed at that time for making such examination, and the nature of the examination without any previous special information or directions, could not certainly on the subject of the delusion as to his children, be considered at all satisfactory. I therefore think it is not a case of full proof. I have come to this conclusion on principles which do not require a resort to the declarations of the family at the time of the several occurrences under review, and it has not been necessary, therefore, to determine whether those declarations might properly be appealed to as part of the *res gestæ*. Laying them aside entirely, the evidence in other respects is quite sufficient to show such a mental condition, and such circumstances attending the *factum*, or occurring about that period, as to require a degree of clearness of proof which the facts in this case do not afford. The instrument must consequently be denied probate.