[Filed March 9, 1888.]

## PETER G. CHRISMAN ET AL., PROPONENTS, *v.* W. S. CHRISMAN ET AL., CONTESTANTS.

WILL CAPACITY—PRESUMPTION.—When a will is shown to have been duly executed, there arises a presumption of sanity in favor of the testator, which, at this stage of the proceedings, unless rebutted or overcome by counter-evidence, will be sufficient to authorize the probate of the will.

INSANITY—BURDEN OF PROOF.—When in a civil proceeding the question of sanity and insanity is directly in issue, while giving to the general presumption in favor of sanity all that may fairly be claimed for it, the burden of proving sanity is upon the party who asserts it.

TESTAMENTARY CAPACITY.—Testamentary capacity is mainly a question of fact, to be determined from a consideration of all the evidence. The testator must have sufficient capacity to comprehend the conditions of his property, his relation to the persons who were should, or might have been the objects of his bounty, and the scope and bearings of the provisions of his will. In deciding upon the capacity of the testator to make his will, it is the soundness of the mind and not the particular state of bodily health that is to be attended to; the latter may be in a state of extreme imbecility, and yet he may possess sufficient understanding to direct how his property shall be disposed of. Old age, sickness, distress, nor debility of body do not incapacitate provided the testator has possession of his mental faculties and understands the business in which he is engaged. The real point in issue is testamentary capacity or incapacity at the precise date of the transaction. What his mental condition was before and after executing the will is only important, as it throws light upon his mind, and shows its actual condition when the will was executed.

WILL—POWER TO MAKE.—The law gives to every man of sound mind the right to dispose of his property by last will, and this is regarded as one of the most efficient means which he has in protracted life or old age to command the attention due to his infirmities.

APPEAL from Lane County.

*J. E. Fenton, W. R. Willis,* and *Ramsey & Bingham,* for Proponents.

*L. & W. R. Bilyeu,* for Contestants.

LORD, C. J.—This is a proceeding brought for the purpose of having an order of the County Court, admitting the will of C. E. Chrisman to probate, vacated and annulled, and to declare it void and of no effect. The will was executed on the twenty-sixth day of November, 1884, and the testator died on the twenty-first day of June, 1885, and left surviving him, a wife and seven children. On the twenty-fourth day of June, 1885, the said will was duly admitted to probate in common form, and the executors thereof having duly qualified, entered upon the discharge of their duties in administering the estate. Subsequently, and on the eleventh day of November, 1885, the contestants filed their petition to the effect: (1) That the said will was not properly executed; (2) that at the time the same was executed, the testator was of unsound mind; and (3) that the will was procured by undue influence. The answer, after denying these facts, alleged affirmatively that the will was executed with the formalities required by law; that the testator was of sound mind, and that the said will was his free and voluntary act and deed. This affirmative matter being denied, and the cause thus at issue, it was referred by the court to a referee to report the testimony. After taking the testimony the referee filed his report, and the County Court proceeded to try the issue, and on the fourth day of October, 1886, adjudged and decreed that the order made on the twenty-fourth day of June, 1885, admitting said will to probate, be vacated, and that the will be declared null and void. Upon appeal to the Circuit Court, the decree entered therein was reversed, and the said will admitted to probate as the last will and testament of the said decedent,

and from this decree of the Circuit Court the present appeal is taken.

The record of this case is voluminous, and the work of reviewing and digesting the mass of testimony it contains has been difficult and onerous. Much of this, no doubt, could have been avoided by restricting the latitude of examination and confining the testimony of the numerous witnesses to the matter in issue. Although by the pleadings, as already outlined, there are three distinct questions suggested for determination, an examination of the record has disclosed, and in fact the argument here has confirmed, that the contest is waged mainly about only one question, namely, whether the testator was of sound mind at the time the will was executed. Our statute of descents gives the property of a decedent to his heirs unless divested by a will, and our statute of wills provides that no one can dispose of his property by last will who is not of sound mind.

When a will is offered for probate, and the mental capacity of the testator to make it is denied and contested, there usually arises the preliminary question, upon whom rests the burden of proof. Upon this point there is much confusion and contrariety in judicial thought, nor is it free from difficulty. There is a general presumption, it is said, in favor of mental soundness, and that usually the burden of proof rests upon the party denying it, whether the question arises upon a will or contract, or upon a trial for crime. This presumption is based on the idea that sanity is the normal condition of the intellect, and that insanity is exceptional and abnormal, hence the general presumption in favor of sanity or mental soundness.

The contestants claim that the *onus probandi* is upon the proponents, not only to show that the will offered for probate was executed according to law, but that the testator was of sound mind when he executed it. As we are satisfied that the will was executed with the formalities required by law, the further consideration of that phase of the subject may be eliminated. The contention of the contestants assumes that an executor in offering a will for probate impliedly asserts that his testator is of sound mind or mentally competent to execute a valid will, and

XVI. OR.—9.

that while it concedes to him the benefit of the presumption of sanity, it does not relieve him of the burden of proving it when called into question, or thereby cast upon the opponents of the will the burden of affirmatively proving insanity. " When a will is shown to have been duly executed," said Prim, J., " the law presumes the competency of the testator." (*Greenwood* v. *Cline*, 7 Or. 56.) This is nothing more than saying that when a will is shown to have been duly executed, there arises a presumption in favor of the sanity of the testator, which at this stage of the proceeding, unless rebutted or overcome by counter-evidence, will be sufficient to authorize the probate of the will.

As Mr. Schouler on Wills says: " When the will is shown to have been properly executed and witnessed, it may be fairly presumed that the testator was competent and unrestrained in the disposition of his property; but that these presumptions being of fact, or mixed law and fact, may be rebutted, and the proponent has nothing more than a *prima facie* case in his favor." (Schouler on Wills, § 174.) But in *Hubbard* v. *Hubbard*, 7 Or. 44, it was said by the same judge, when the validity of the will as here is attacked by a direct proceeding, that " in every such proceeding the *onus probandi* lies upon the party propounding the will, and he must prove every fact which is not waived or admitted by the pleadings, necessary to authorize its probate in the County Court. Whatever may be the form of the issue as to every essential and controverted fact, he holds the affirmative." In *Perkins* v. *Perkins*, 39 N. H. 171, Bell, C. J., after reviewing the authorities, said: " It is therefore proper to say that the burden of proving the sanity of the testator, and all the other requirements of the law to make a valid will, is upon the party who asserts its validity. This burden remains upon him until the close of the trial, though he need introduce no proof upon this point until something appears to the contrary." This doctrine that the burden of proving sanity when denied and contested rests upon the executor, or whoever sets up the particular will in controversy, was very ably asserted and maintained by Thomas, J., in *Crowninshield* v. *Crowninshield*, 2 Gray, 524, and has been frequently approved and followed. (See, also,

*Rigg* v. *Wilton*, 13 Ill. 15; 54 Am. Dec. 419; *Cilley* v. *Cilley*, 34 Me. 162; *Robinson* v. *Adams*, 62 Me. 369; 16 Am. Rep. 473; *Cramer* v. *Crumbaugh*, 3 Md. 491; *Morrison* v. *Smith*, 3 Bradf. 209; *Delafield* v. *Parish*, 25 N. Y. 32; *Baldwin* v. *Parker*, 99 Mass. 84; 96 Am. Dec. 697; *Comstock* v. *Hadlyme*, 8 Conn. 254; 20 Am. Dec. 100; *Evans* v. *Arnold*, 52 Ga. 169; *Beaubien* v. *Cicotte*, 8 Mich. 9; *Garvin* v. *Williams*, 44 Mo. 465; 100 Am. Dec. 314; *Williams* v. *Robinson*, 42 Vt. 658; 1 Am. Rep. 359; *Renn* v. *Samos*, 33 Tex. 760; *Jenkins* v. *Tobin*, 31 Ark. 306; *McMechen* v. *McMechen*, 17 W. Va. 683; 41 Am. Rep. 683; *In the Matter of the Will of Convey*, 52 Iowa, 197; Redfield on Wills, 28, 30; Schouler on Wills, §§ 169, 174; 6 Wait's Actions and Defenses, 383; Abbott's Trial Evidence, 113, 114.) Such, also, seems to be the English rule.

In *Barry* v. *Butlin*, 1 Curt. Ecc. 637, Baron Park said: "The rule of law, according to which cases of this nature are to be decided, do not admit of any dispute so far as they are necessary to the determination of the present appeal, and that they have been acquiesced in on both sides. These rules are two; the first that the *onus probandi* lies in every case upon the party propounding the will; and he must satisfy the conscience of the court that the instrument so propounded is the last will of a free and capable testator." "Whether the party propounding a will," said Cresswell, J., "relies upon a *prima facie* case, or gives the whole of his proof in the first instance, the *onus* remains on him throughout." (*Sulton* v. *Saddler*, 36 Barb. 87; *Wallis* v. *Hodgeson*, 2 Atk. 56; *Ogle* v. *Cook*, 1 Ves. Sr. 177; *Jackson* v. *Hesketh*, 2 Stark. 518; *Fulton* v. *Andrew*, Law R. 7 H. L. 448; 12 Moak E. R. 76; *Hodges* v. *Holder*, 3 Camp. 366.) So that although numerous authorities may be cited *contra*, the rule deducible from these to which we have referred, while admitting the presumption of sanity to exist, when in a civil proceeding the question of sanity and insanity is directly in issue, fixes the burden of proving sanity throughout the entire trial upon the party who asserts it. And Mr. Schouler says in his excellent work already referred to, that "the larger and better class of American authorities point to the conclusion that the court or

jury trying the case must, upon the whole evidence, be satisfied that the testator was of sound mind; so that if there be inevitable doubt left on this point from all the testimony, the will cannot be considered as proved." And adds that "this conforms to the English rule as stated." (Schouler on Wills, § 147, n. 5.) So that testamentary capacity is mainly a question of fact, to be determined from a consideration of all the evidence in conformity to the principle as already stated. Before recurring specially to the evidence, there are some facts which lie on the surface of the record that need to be mentioned.

It appears that the testator with his wife and children emigrated from Missouri to Oregon in the year 1851, crossing the great plains with ox teams. After some changes of residence during the first years he finally settled in Lane County, of this State, where he accumulated a large estate, and died at an advanced age. The facts indicate that he was a man of but meager education, but possessed of a vigorous understanding, and much energy and decision of character. To these qualities he joined habits of great industry, strict economy and sobriety, and vigilant attention to his own affairs and business interests. As a result of such a combination of traits he early began to acquire property and to make money, which he prudently managed and safely invested, and thus continued to do and to accumulate without much abatement almost to the day of his death.

It is no doubt true that he "loved money," and was indefatigable in the pursuit of its acquisition, but his sound judgment and strong sense of right and justice made him an honest man. In all his dealings and conduct, so far as this record discloses, although always keenly alive to his own interests, and when menaced, ready to take the aggressive for their protection or security, there is no imputation of bad faith or trick on dishonesty. A man always of decided principles, his convictions were strong and not easily influenced, and being self-reliant and of a somewhat logical turn of mind, he rarely took counsel from others, but formed his own opinions, to which he adhered and from which he was seldom converted by the opinions of others.

A character of this kind absorbed in business pursuits, and devoted for many years to the acquisition of wealth, dominated by a robust and energetic mind, but not devoid of the social affections and virtues which render domestic life attractive, could not fail to attract attention and become a commanding figure in the small community in which he resided. As a consequence he was quite generally known throughout his county, and died one of its wealthiest citizens. In such case, any marked deviation in his habits of thought, or any aberration of mind indicative of incapacity to transact ordinary business, would have been readily noticed and remembered, and the decisive proof of it would have been easy and accessible. Now what is the nature of the facts, or the character of the evidence by which it is sought to be shown that the decedent was incapable of executing a valid will.

A short time prior to his death, and when he was nearly seventy-four years of age, the will in controversy was executed. It was written at the request of the decedent by Mr. Joel Ware, who had been acquainted with the testator for over a quarter of a century, and had been clerk of the Circuit Court for that county for nearly an equal period. Scarcely any one could have been selected under the circumstances more suitable to have written the will. His personal intelligence and high character, his long personal acquaintance with the testator, and his knowledge of legal matters as an officer of the court, are an assurance that he understood and appreciated the business he was called upon to perform, and comprehended his duty and what the law expected of him; and that if the testator had been of unsound mind, and surrounded by interested and obtruding advisers, he would have noticed it, and doubtless have refused to write it, or at least suggested it be deferred to some other time. His testimony is clear, explicit, and unimpeached.

It is not possible to state it in detail, but in substance it goes to the effect that the will was dictated by the testator; that he understood the nature of the business, the property he had, upon whom he intended to bestow it, and the manner he meant to distribute it between them. Mr. Ware testifies that he had

been intimately acquainted with and transacted business for the testator at intervals for twenty-seven years; that about the 22d of October, 1884, he received a letter from the testator asking him to come to Cottage Grove to rewrite his will (he had written a will for him some ten or twelve years before), and that he, on the 26th of October, 1884, accordingly went and arrived at the house about three o'clock, and found the testator had gone to the postoffice, whither he went and returned with him to his house. "When I got ready to write the will, Mr. Chrisman said to me: 'Now, Ware, I tell you what I want in that will, and I want you to put it into shape so that it will stick.' I wrote down as he told me until we came to the bequest to Chrisman F. Chrisman, when I suggested to him the allowance two hundred dollars per year appeared small, as it would only be about one fourth of the interest of the amount left him. He said, 'if you think so, hold on a minute.' He then got up, walked the floor, went out on the sidewalk, and after walking back and forward a few times he came in and told me to put it down; that it was sufficient to support him, and that every dollar he got over that would go. I then suggested that in case of sickness or disability it would not be sufficient. He said, 'that is so; I hadn't thought of it; fix it so that the trustees can give what in their judgment may be necessary in case of sickness or disability.' I made no further suggestion, *simply put in shape what he told me to put down.* After the will was written, I read it over to him section by section. He told me not to seal the will that night, and in the morning before I left he had me to read the will to him again, said he believed it was all right, but not to seal it as he wanted to read it by himself. That no one was present but Mr. Chrisman and myself, and Mrs. Chrisman was in and out of the room at times, and that Mr. Chrisman dictated the will, and the whole of it, and that he referred to no memoranda or paper while he was dictating it. That the old will I had before me, I think a will I wrote some twelve years before, and that the general drift of the two wills was the same, some small change in amounts, and a change in executors.'

Upon the question as to his sanity at the time the will was

written and before that time, and after, etc., he testified: "The question of his sanity or insanity never entered my mind until after his will was probated. I saw no difference in him mentally from what I had known for twenty-seven years. I always considered Mr. Chrisman sane. In all his business transactions I never saw anything that to my mind would indicate insanity or mental weakness." After explaining about the former will, the correspondence which passed between him and the testator, and some deeds to certain property which he had written in answer to the inquiry as to his business capacity, he testified: "I never saw anything in his business habits to indicate any mental weakness. I always considered him a safe business man." Answering the inquiry as to his firmness, and the tenacity with which he contended for his own particular views on questions of business or otherwise, he said: "He was a man who did his own thinking. He would frequently *ask me how to do certain things, but he never asked me what things to do.* As to the disposition of his property, I inferred from his words and actions that he wished to dispose of his property in the manner he told me; the same as I set down in the will, and that he wished his property to descend to his blood relations." And again, "that he wanted to leave the children all well fixed and comfortable in this world's goods, and after that he wanted the balance of the property to go to those of the children whom he thought would be most likely to take care of it. I understood that to be his motive all through both wills. In my judgment, this is the key to the motive which prompted him to make the unequal distribution of his property by will, and which is undoubtedly the real ground of complaint against him."

It is not possible to review at any greater length the testimony of Mr. Ware, and we must content ourselves with saying that the examination of his evidence has satisfied us that the reasons which he assigned for the opinions expressed as to the sanity of the testator, and his capacity to transact business, are founded on facts and circumstances detailed from which no other rational or logical conclusion can be drawn, and that his long and intimate acquaintance gave him the opportunity to observe

any variation in his mental vigor, so that, if any existed, especially when he was called upon to write a will, which was to be the final disposition of the testator's property, he would not only have detected it, but his admitted intelligence and integrity of character are such that he would have esteemed it his duty to have made it known. Yet it never occurred to this witness, who knew he was enfeebled by age and disease, that there was any decay of his faculties or such mental incapacity as unfitted him to make a valid will. What constitutes testamentary capacity or "sound mind" within the meaning of the law has been repeatedly settled by this court. (*Heirs of Clark* v. *Ellis*, 9 Or. 128; *Hubbard* v. *Hubbard*, 7 Or. 42.) The testator must have "sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will." (*Converse* v. *Converse*, 21 Vt. 168; 52 Am. Dec. 58.) He "must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and to be able to form some rational judgment in relation to them." (*Delafield* v. *Parrish*, 25 N. Y. 9.)

"The phrase 'sound mind,'" said Sir James Hanner, "covers the whole subject, but emphasis is laid upon two particular functions of mind which must be sound in order to create capacity for the making of a will, for there must be memory to recall the several persons who may be supposed to be in such a position as to become the fitting objects of the testator's bounty; above all, there must be understanding to comprehend their relations to himself, and their claims upon him." (*Broughton* v. *Knight*, Law R. 3 Pro. & D. 64; 6 Moak E. R. 350.) This probably is about as correct a definition of the law as any given, but it is merely a reiteration in a different phrase of what has been repeatedly expressed by other judges. The difficult question is to determine what degree of mental capacity will entitle a person to make a will. The exposition of the law, as contained in the

case of *Stevens* v. *Van Cleave*, 4 Wash. C. C. 267, 268, was approved and adopted in *Clark* v. *Ellis*, 9 Or. 128, by this court, and I find it frequently repeated and followed as a correct definition of testamentary capacity in other cases.

Mr. Justice Washington said : "He (the testator) must, in the language of the law, be possessed of a sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extinguished cannot be said to possess understanding in any degree whatever, or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease; he may not be able at all times to recollect the names, the persons, or the families of those with whom he has been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and digest all parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator as this, had he a disposing memory? was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, was his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed the will?" (*Harrison* v. *Rowan*, 3 Wash. C. C. 580; Redfield Am. Cases on Wills, 53; *Rice* v. *Rice*, 50 Mich. 448; *Freeman* v. *Easly*, 117 Ill. 317; *Will of Blakeley*, 48 Wis. 294; *Brinkman* v. *Rueggesick*, 71 Me. 553; *Brown* v. *Riggin*, 94 Ill. 560; Schouler on Wills, §§ 67–74; Redfield on Wills, pp. 120–135.) Other authorities might be cited, but these are sufficient to show the standard of capacity upon which the law insists to entitle a person to make a valid will. And it is noticeable, and needs to be

emphasized, that in "deciding upon the capacity of the testator to make his will, it is the soundness of the mind and not the particular state of bodily health that is to be attended to; the latter may be in a state of extreme imbecility, and yet he may possess sufficient understanding to direct how his property shall be disposed of." (*Harrison* v. *Rowan*, 3 Wash. C. C. 585; *Sloan* v. *Maxwell*, 2 Green Ch. 570; *Van Alst* v. *Hunter*, 5 Johns. Ch. 159; *Den* v. *Vancleve*, 2 South. 660; *Banks* v. *Goodfellow*, Law R. 5 Q. B. 562.)

That great age and bodily disease and afflictions may impair the mind or destroy its functions, rendering it unfit to transact ordinary business, is not disputed. But if such is the case, it it must be shown, it cannot be assumed; for the law is well settled "that neither old age, sickness, nor extreme distress or debility of body incapacitate, provided the testator has possession of his mental faculties and understands the business in which he is engaged. The test is the integrity of the mind, not the body." (Redfield on Wills, 97, 102, 125.) It often happens that aged and infirm persons, who seem to have lost nearly all memory on different subjects, when their attention is once fixed upon their own property, business, or family, understand them well. (Taylor's Medical Jurisprudence, 336.) In such case, the only effect of extreme old age is to excite the diligence of the court to inquire more closely into his mental capacity.

As to the testator's physical health there is little divergence of opinion among the witnesses; all agree that it was feeble, and that his mind was not so alert and vigorous as formerly, and some think it was so impaired as to incapacitate him to transact ordinary business, although the reasons some of them assign for such opinion is not entitled to so much weight. To entitle a witness' opinion to much consideration, he must have knowledge of what testamentary capacity means, "else," as Paxton, J., said, "no man's will would be safe." (Eddy's Appeal, 109 Pa. St. 406.) Although evidence prior and subsequent to the making of a will is admissible for the purpose of throwing all possible light on the subject, to enable the court to determine whether the will in controversy was executed by a sound mind,

yet it is not to be forgotten that testamentary capacity or incapacity at the precise date of the transaction is the real point at issue. (Schouler on Wills, § 186.) Hence, great weight is attached to the testimony of subscribing witnesses; for they have the opportunity to observe the mental condition, and all the circumstances surrounding the execution of the will. (Schouler on Wills, § 179.) But the final decision of the case does not depend on them, but upon all the evidence adduced.

They may all deny the sanity of the testator, and yet if the proof of a sound condition of mind is shown by the whole evidence, the will must be upheld. (*Perkins* v. *Perkins*, 39 N. H. 169; *Thornton* v. *Thornton*, 39 Vt. 122.) Shortly after his will was drawn by Mr. Ware, the testator executed it in the presence of four witnesses who were his neighbors and friends, and whom he had invited to his house for that purpose. When they had assembled, he produced his will and said: "Gentlemen, this is my will, and I desire each one of you to witness my signature, and also each other's signatures." That he then signed, and the witnesses signed, one of them at his request filling in the dates.

These subscribing witnesses had all known him for many years, lived in the same village, and frequently saw him, knew that his health was feeble, and that he sometimes complained of pains in his head and kidneys; was accustomed to his ways, to conversing with him, and hearing him converse with others, and enjoyed unusual opportunities to observe any failing of his mental powers, or indications of mental weakness to which he might expose himself, and we may reasonably suppose that if they had harbored any suspicion that he was losing his mind or incapable of transacting ordinary business, they would have been on the alert and ready to make a memorandum of it on their minds on such an occasion as had called them together; yet none of them noticed anything in look, gesture, talk, or conduct that gave the slightest indication of incapacity or mental weakness; nor does it seem that any suggestion of that kind ever occurred to their minds. On the contrary, the facts and circumstances as they occurred, and are narrated by these

witnesses, what was said and done, shows as conclusively as any occurrences of this kind usually do, that he fully understood and comprehended the nature of the business in which he was engaged, and the purpose for which he had invited them to his house. Not one of them at that time had the faintest idea that he was insane, much less had formed an opinion upon any facts or acts of his from which insanity was reasonably inferable. It is his capacity at that time to make his will which is the real point at issue. What his mental condition was before or after executing it is of no importance, only as it throws light upon his mind, and shows what its actual condition was when the will was executed. "Saw nothing wrong," nor "unusual," "thought he understood what he was doing," is the language of all these witnesses at the precise date when the will was executed.

It is true, several months after when this contest was begun, some of them at the time their testimony was taken expressed an opinion that he was of unsound mind at the time the will was executed; but it expressly appears that such opinion was not formed until a long time afterwards, nor do they claim otherwise. But the reasons assigned for such opinions are not entitled to a moment's consideration in law. This can be well shown by illustrations from the evidence. "Well, from what I have heard, I don't know what my opinion is. From what other men say who had dealings with him, I think something was not right with him in some way. *From what I have heard since* I don't think his mind was altogether sound at the time he signed the paper."

This opinion is not only based on hearsay but since the execution of the will, and is utterly worthless in law. More, it is in direct contradiction of the opinion he formed of the testator at the time the will was executed, and when he saw and observed the facts of which he testified. "I noticed nothing unusual in his conversation at the time, it seemed to be his free will; understood what he was doing. I suppose he was all right at the time; that was my opinion at that time." Another of them says: "From what the old man told me *since* he made his will in regard to the division he made with his children, etc., I believe

there was something wrong." He depreciates as another witness does his incompetency to judge of his sanity, and says he does not understand what "a sound and disposing mind means." But it is perfectly manifest from his testimony that he did not consider him of unsound mind at the time of the execution of the will, but "from the knowledge I have got since," he says, "I am satisfied there was something wrong somewhere." Another says: "I thought nothing of the matter at the time, that is, his sanity at the time the will was signed, and for that reason could not have any opinion at all about the matter."

These references must suffice, but they are sufficient to show how valueless these changed opinions are for any purpose of this case. Based not on facts observed but hearsay, or the injustice of an inofficious will, formed long after its execution, and the after-thought of neighborhood discussion, in flat contradiction of the impressions they formed at the time, from what they saw and observed of the testator's capacity to make a will, and their solemn act in the attestation, such opinions are without legal or other merit, and must be disregarded. The facts and circumstances occurring at the execution of the will, and as narrated by them, are consistent with mental soundness, and this was the impression which such facts then produced on their minds, and is the best evidence of his sanity. At the argument a good deal of reliance was placed on the testimony of Dr. Whiteaker as tending to establish *smile dementia*.

There is no doubt that the testator during the last year or so of his life was in feeble health, suffering some, and complaining a good deal, and at times peevish and querulous. But in examining the doctor's testimony it is important to note that it touches but two distinct periods, one in July, 1884, and the other in his last sickness, in which he undertakes to speak directly as to his mental condition. All other is speculative and inferential; nor does the doctor undertake to say what the actual consequence was, or would be, but only to state upon the data he had, what study and experience in that particular subject had indicated to often follow as the result of such symptoms or condition. For the uncontradicted facts remain that the tes-

tator, between the periods noted, often went on the streets of his village again, talked and dealt occasionally with his neighbors and friends, and attended public meetings, political and otherwise, and did those things usually done by persons of his age and condition, unnoticed and unsuspected by any one of insanity, or any such mental blindness as unfitted him for the ordinary transactions of life.

There is besides this his correspondence upon various matter within this period, to which we shall presently refer, that shows as conclusively as any act of the human mind can, that he had not only memory to retain and state facts which concerned his family, his will, and his business with accuracy, but to reason upon them with a sense and judgment which showed that he fully comprehended his own affairs and business, and possessed the capacity to direct and control them.

"In July, 1884," the doctor says, "I *believed his* mind was affected, and during his last illness *I knew* his mind was affected." But he does not undertake to say what his mental condition was in the *interim* or at the time the will was executed, or do more than infer from the symptoms observed the consequences which might follow. But we all know, and the authorities already cited, and to which many more might be added, show that old age, and the ills of distress, debility, and sickness, which often accompany it, do not incapacitate if the testator has possession of his faculties and understands what he is doing, and that such a condition may exist without perversion of the judgment. (*Sloan* v. *Maxwell,* 2 Green Ch. 581; *Dew* v. *John,* 2 Green Ch. 454; *Van Guysling* v. *Van Kuren,* 35 N. Y. 73; *Jackson Hardin,* 83 Mo. 176; *Hoban* v. *Piquette,* 52 Mich. 355.) It is not until the reason is invaded, followed by incoherence of ideas and a misapprehension of his relations to his family and society, that the testator can be regarded as insane and unfit to make a valid will.

Although many witnesses were examined on both sides, those for the proponents asserting his sanity, yet many for the contestants speak doubtfully in expressing their opinion, "thought something was wrong," "do not feel competent to judge," and

like expressions, and some others who assert his insanity are without any reason for it, or if a reason is assigned, in many instances it is not satisfactory and shows a lack of knowledge and judgment in such matters. His daughter, Mrs. Cathey, did not think his mind was *very sound* at the time he made his will, and yet the testimony shows when she was applied to for a loan of nine hundred and fifty dollars only the day after the will was executed, and that she refused to make the loan until "she could see 'pap' about it, and if 'pap' said it was safe in loaning that much money on the land I could have it," and required the mortgage to be submitted to him "to see if it was all right." Evidently Mrs. Cathey then thought her father had sufficient capacity to understand business, and preferred his judgment to her own. Another says that about the time he made his will he "was not as sane as before," and the only reason he has for this opinion is, "was his complaining and physical and mental weakness." This witness does not say that he deemed him insane, and the reason amounts to nothing.

Two or three others think his mind was unsound on the subjects of money, politics, and woman suffrage, etc.; that the enfranchisement of women would work the downfall of the republic. One says: "At times he appeared sane enough and at other times he did not," and his reasons were "a controversy about the newspaper dispatches." This witness and the testator were of opposite political faith, and disagreed as to the correctness of the Oregonian dispatches in the campaign of 1884. Now here is the reason which he gives that first caused him to think that the testator was "mentally wrong." " I told him the Oregonian would not publish anything detrimental to the cause it advocated, and he asserted that a public journal that took the associated press dispatches had to publish them."

The value of such a reason for such a purpose is not only worthless but undeserving of comment. We have not the space to review the evidence, but the truth is, the witnesses, with few exceptions, who undertake to impeach his mental soundness, do not claim to have observed it, much less to have formed any opinion in respect to it until the condition of the will began to

be discussed, and after this proceeding was begun to set aside the will. It was the fact that he had not distributed his estate equally among his children, but had given marked preferences to some over others that bred discussion and comment, and men began to remember peculiarities and eccentricities of character, and to recall many things he said and did, which at the time they regarded as undeserving of notice, but that then appeared as *indicia* of mental aberration or unsoundness. But it would hardly be safe to set aside a will on the ground that the testator was not of sound mind because he had not distributed his property according to what might be a witness' notion of a testator's duty in that particular.

We must remember that the law concedes to every man of sound mind the right of saying to whom his property shall pass by last will. Here is the case of an old man feeble in health and perhaps wasting away with old age, who by his energy and thrift, his frugality and business sagacity, had acquired a large fortune, and all admit retained mental stamina, judgment, and capacity enough to take care of it, and yet because in distributing it among his children he has made preferences in favor of those whom he thought would take best care of it, and not squander the hard earned and harder saved fruits of his toil, his will is attacked, his life ransacked and exposed, and we are asked to declare him insane and his will void. Chancellor Kent said: "It is one of the painful consequences of extreme old age, that it ceases to excite interest and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attention due to his infirmities." (*Van Alst* v. *Hunter, supra.*) But independent of these considerations, there are facts disclosed by the record which show that he did do business about this time with sense and judgment, which is better proof of his capacity to understand and comprehend such transactions than the mere opinion of witnesses, not founded on any actual business affair; that he was incapable of transacting business, and hence could not have made the will in dispute. It was during this period

that he sold and assigned three mortgages, sold a large tract of land, made deeds, bought a piece of land for one of his sons, wrote numerous letters on business topics and other subjects which are full of good sense and judgment, and utterly refute the imputations of mental unsoundness; paid some bills, deposited five thousand dollars with Mr. Walker, taking his receipt therefor, canceled the Harpole mortgage and took a new one, and made numerous entries in his memorandum book.

No one pretends there was any lack of judgment or capacity displayed in transacting these important business matters, or that he did not understand and know what he was doing. Why then was he incapable of making his will? Take his letters to his attorney, written only a short time before the will in controversy was made, and when it is asserted that he was unable to transact business, and the questions he propounds necessarily imply the power to reason and a knowledge of the subject suggested, so far at least as it concerns his own business affairs. He writes Mr. Willis: "If a man has a married daughter, and she has no children, and you was to deed to her and her body heirs, and she was to die without having children, having a husband, who would fall heir to that land, her brothers and her sisters, or her husband?" and then asks: "Does the word 'body heirs' include brothers and sisters and exclude husband?" requests his attorney to furnish him appropriate words to exclude the husband as heir of his wife. These are not the suggestions of a mind groping in mental darkness, but pertinent inquiries to the business he then had in contemplation. His daughter, Mrs. Cathey, was childless and he desired to deed land to her in such a manner as to exclude her husband.

There are several other letters to his attorney in respect to judgments, foreclosure suits, service, questions as to road tax, etc., all of which state the point of inquiry clearly and concisely, and show how well he understood, and what vigilant attention he gave to his business affairs. There are also several written to his son; one just before and another shortly after the execution of the will. In the one he gives him a copy of a form for an assignment of a note and mortgage, and then proceeds to

XVI. OR.—10.

advise him in respect to the matter, that the lawyer and the business man would both at once pronounce true and judicious, and then says: "Now let me in conclusion give you what I know from long experience to be good advice in business transactions, to wit., be very careful to have all your papers fixed up right, and don't depend on Dick and Tom's word too much, for everybody is willing to take and nobody is willing to give, and be sure not to take mortgages too near the value of the property, for, as a general rule, when you have to sell under execution the property will only bring about one half of what it is rated at when the mortgage is given." In the other he had bought a piece of land for his son, and says: "I got the whole square west of the Bob Clark claim and paid $200. I sent to Ware and got him to see if the title was clear, and to tell me how much land there was in a certain boundary. That little plat that I sent to him by Bob to fill out I will enclose in this, so that you can see exactly the land I bought for you. There is, you will see, 52.84 acres. When I was making the trade with Whiteset I supposed there was about 30 acres. He got it at 40 acres, but I was to have all in the plat, now you will see says 52.84, so as to make no jogs in that part of your land. . . . . . I paid for recording it. I have charged you in my book $201 —— $1 for recording. I think it is a good bargain for this reason, the three corner pieces is good land and suits your other lands."

We have not the space for further quotations, but these are sufficient to show how he thought and wrote and acted just before and after the execution of the will, and to strongly corroborate the testimony of Ware as to his sanity when the will was written, and to show why the subscribing witnesses saw nothing "unusual," and thought his mind was "sound," and that "he appeared to understand what he was doing" when they assembled at his house for the purpose of attesting his will. There is no doubt that the testator was in feeble health, and slowly passing out of life into the grave, but despite bodily ills and pains, the evidence shows, although his mind was less vigorous, that enough of that strong inherited common sense and resolute will remained to understand the nature of the act

and its effects, the property he had, to whom he intended it should pass. Without regard to the evidence for the proponents, the evidence of the contestants taken as a whole does not show more than a case of an old man, feeble in health and suffering occasionally from bodily ills, growing peevish and querulous, and exhibiting at times mental weakness, but which does not show insanity or incapacity to know and understand, and appreciate what he was doing, whether of business or otherwise. Nor are the reasons assigned for the opinions entertained always worthy to be taken into account.

As a result it is our opinion that the testator was of sound mind when he executed the will in controversy, and that it was the product of his own free agency. And in conclusion we may say that while it has been our duty to criticise some of the testimony, we would not have it inferred that we do not recognize in them good, reputable citizens, testifying to what they believed to be true, and as they understood and reasoned upon the facts.

On the question of undue influence we do not think there is any evidence to sustain the issue, nor was much attention given to it at the argument. And finally, in view of some facts and circumstances to which it is not necessary to refer, the costs and disbursements must be paid by the estate, of this court and the lower courts, and the decree of the Circuit Court in all other things affirmed, and it is so ordered.