Argued 26 February, decided 19 March, 1907.

## PICKETT'S WILL.

89 Pac. 377.

WILLS—ELIGIBILITY OF WITNESS TO BENEFICIAL APPOINTMENT.

1. Under Section 5564, B. & C. Comp., providing that if any witness to a will shall receive thereunder any beneficial appointment affecting any property passing under the will it shall be void, a provision in a will appointing a certain attorney to assist the executor in settling the estate neither gives nor makes to such attorney any beneficial appointment of or affecting any real or personal estate so as to affect his qualification as a witness, since it is merely advisory.

EXECUTORS AND ADMINISTRATORS—SELECTION OF ATTORNEY.

2. The appointment of an attorney to advise an executor is a matter entirely personal to such officer, and he is not bound by any provisions or suggestions in the will.

WILLS—EXECUTION BY ANOTHER FOR A BLIND TESTATOR.

3. The signing of a will for a blind person by another at the request of the testator, where the latter can hear and speak and is present, is sufficient; and the same rule applies to the witnessing.

WILLS—BURDEN OF PROOF IN PROBATING.

4. In probating a will in both common and solemn form the burden of proof is on the proponent to establish the testamentary capacity of the testator and the regular and free execution of the document presented for probate.

MENTAL CAPACITY—CASE UNDER CONSIDERATION.

5. The testator who executed the will under consideration was 68 years old, blind, and in gradually failing health from a progressive hardening of the arteries which resulted in physical prostration, owing to inability to control any muscles, and a gradual failure of mind followed by death from want of arterial blood. It appeared, however, by the positive testimony of persons present. that at the time the will was executed testator was in possession of his mental faculties, recognized the persons present and stated that he knew the contents of the will and was satisfied with it. Opposed to this was the testimony of his physician and of medical experts that he could not at that period of his sickness have had mental power to know what he owned or who were his natural beneficiaries, unless the property was of such a nature as to be easily divided among a few persons. Positive reliable testimony of what actually occurred seems more convincing than opinion testimony that such an occurrence was impossible, and it is the conclusion of the court that the testator had testamentary capacity, notwithstanding his debilitated condition.

WILLS—EVIDENCE OF UNDUE INFLUENCE.

6. In view of the positive nature of the testator, that in framing his will he carried out a plan stated long previously, and that there is no direct testimony of any attempt to influence him, it must be concluded that the will in question is . the product of his unrestrained wish and is valid.

WILLS—COSTS ON APPEAL.

7. In view of the outcome of this contest the costs and disbursements of the appeal will be assessed against the appellants, who were unsuccessful.

From Lane: James W. Hamilton, Judge.

Statement by Mr. Commissioner Slater.

This is a contest over the will of George W. Pickett, who died in Lane County, November 22, 1902. What purports to be his last will and testament was admitted to probate in that county four days after his death, and letters testamentary were issued to S. B. Eakin, the executor mentioned therein. The will gave to each of decedent's brothers and sisters, except to two whom he mentions as being dead, and his sister Agnes Joyce, or to their surviving children, $250; to his niece, Katie White, $1,000; to his friends, Henry Hoffman and his wife Helen Hoffman, each $500; to the Masonic lodge, $100, in trust, the interest to be used in keeping his grave in repair; and to Mrs. Joyce, the remainder of his property—and directed that George B. Dorris, his lawyer, assist the executor in settling his estate. Thereafter the contestants herein filed a petition to vacate and annul the probate of said instrument, and prayed that it be declared not to be the will of said George W. Pickett. The grounds for the relief asked are: (1) That the will was not legally executed; (2) that the testator did not possess testamentary capacity; and (3) that it was made under undue influence. After taking a large amount of testimony the court affirmed its former order of probate. From this decree an appeal was taken to the circuit court, which concurred in the original finding, and contestants appeal to this court.          AFFIRMED.

For appellants there were oral arguments by *Mr. Lark Bilyeu* and *Mr. Absalom Cornelius Woodcock,* with a brief over the names of *L. Bilyeu, A. C. Woodcock* and *Thompson & Hardy* to this effect.

I. The rule is fully established in this state that the burden of proof is upon the proponents to establish by competent tes-

timony the facts necessary to show the legal execution of the will and the testamentary capacity of the testator.

II. When the testator is blind and unable to speak, with his mind impaired, the ordinary subscription and execution of the will in the manner prescribed by statute is not sufficient proof upon the question whether the instrument offered for probate expresses the wish of the testator. When the will is executed it must be so executed as to show that the testator fully understood all that was done and wished just that thing to be done. The ordinary presumptions do not prevail in such a case as this: *Delafield* v. *Parish,* 25 N. Y. 9, 35; *Rollwagen* v. *Rollwagen,* 63 N. Y. 504, 517; *Wier* v. *Fitzgerald,* 2 Bradford, Sur. Rep. 42; *Van Pelt* v. *Van Pelt,* 30 Barb. 134; *Chaffee* v. *Baptist Missionary Soc.* 10 Paige, Ch. 85, 90; *Barry* v. *Butlin,* 1 Curt. Eccl. 639; Jarman, Wills, Vol. I, p. 29.

III. The rule as to what constitutes testamentary capacity in an ordinary case has been fully established in this state, but in proportion as the infirmities of the testator expose him to deception, it becomes imperative to require more positive proof that the testator did in fact fully understand every portion of the paper that he executed as his will.

For respondents (proponents) there were oral arguments by *Mr. Benjamin B Beekman* and *Mr. Jerry England Bronaugh,* with a brief over the names of *George B. Dorris, Watson & Beekman* and *Bronaugh & Bronaugh* to this effect.

1. The statute has prescribed the formalities with which a will shall be executed in this state. It must be in writing, signed by the testator, or by some other person under his direction, in his presence, and must be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator: B. & C. Comp. § 5548; *Skinner's Will,* 40 Or. 571, 580 (67 Pac. 951).

2. It is not essential that the testator shall himself request the witnesses to attest the will. The request may be made for him by another: *Ames' Will,* 40 Or. 495, 498 (7 Prob. Rep.

Ann. 536: 67 Pac. 737); *Skinner's Will,* 40 Or. 571, 585 (67 Pac. 951).

3. Under the rule prescribed and followed by the Oregon cases the instrument may be well executed without a word being uttered or intimation made by the testator, or any person for him, to the attesting witnesses or in their presence, that the writing being signed or executed is a will; neither need they know anything of its nature or import. The signing of the will by the testator in the presence of two or more competent witnesses, who subscribe their names thereto as such, in his presence, is sufficient: *Luper* v. *Werts,* 19 Or. 122, 135 (7 Am. Prob. Rep. 243: 23 Pac. 850) ; *Skinner's Will,* 40 Or. 571, 580 (67 Pac. 951).

4. The statute does not require that a will be read to the testator in the presence of the attesting witnesses, even though he is blind: B. & C. Comp. § 5548; *Skinner's Will,* 40 Or. 571, 579 (67 Pac. 951) ; *Martin* v. *Mitchell,* 28 Ga. 382, 384; *Wampler* v. *Wampler,* 9 Md. 540, 550; *Hess's Appeal,* 43 Pa. St. 73 (82 Am. Dec. 551) ; *Guthrie* v. *Price,* 23 Ark. 396, 408; *Hemphill* v. *Hemphill,* 13 N. C. 291 (21 Am. Dec. 331) ; *Boyd* v. *Cook,* 3 Leigh, 32; 1 Jarman, Wills (6 ed.), 35; 1 Redfield, Wills (4 ed.), 53, note 4.

5. A subscribing witness who is a beneficiary legatee or appointee under the will is competent to testify concerning the execution of the will and the testamentary capacity of the testator: B. & C. Comp. § 5564; 1 Redfield, Wills (4 ed.), pp. 253-4; 2 Greenleaf, Evidence (14 ed.), § 691, and notes 3 and *b*; *White* v. *Parr,* 168 Ill. 459 (48 N. E. 113, 117).

6. A mere appointment as attorney to assist the executor is not a beneficial appointment within the meaning of the statute. The right of an executor to select his attorney cannot be controlled, even by the will of the decedent: *Waite* v. *Willis,* 42 Or. 288, 290 (70 Pac. 1034) ; *Young* v. *Alexander,* 16 Lea, 108; 11 Am. & Eng. Enc. Law (2 ed.), 1241.

7. The rule is settled in this state that if a testator at the time he executes his will understands the business in which he

is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body or extreme distress: *Hubbard* v. *Hubbard*, 7 Or. 43, 45; *Heirs of Clark* v. *Ellis*, 9 Or. 128, 134-148; *Chrisman* v. *Chrisman*, 16 Or. 127, 132 (6 Am. Prob. Rep. 156: 18 Pac. 6) ; *Luper* v. *Werts*, 19 Or. 122, 125 (7 Am. Prob. Rep. 243: 23 Pac. 850) ; *Franke* v. *Shipley*, 22 Or. 104, 105 (29 Pac. 268); *In re Cline's Will*, 24 Or. 175, 177-178 (41 Am. St. Rep. 85: 33 Pac. 542) ; *Carnegie* v. *Diven*, 31 Or. 366, 369 (49 Pac. 891) ; *Swank* v. *Swank*, 37 Or. 439, 444 (61 Pac. 846) ; *Ames' Will*, 40 Or. 495, 504 (7 Prob. Rep. Ann. 536: 67 Pac. 737) ; *Skinner's Will*, 40 Or. 571, 576 (67 Pac. 951) ; *Dean* v. *Dean*, 42 Or. 290, 298 (70 Pac. 1039).

8. It has also been established that the mental capacity of the testator is to be tested as of the time of the execution of the will, and, other things being equal, the evidence of the attesting witnesses and, next to them, of those present at the execution of the will is most to be relied upon: *Heirs of Clark* v. *Ellis*, 9 Or. 128, 147; *Chrisman* v. *Chrisman*, 16 Or. 127, 138 (6 Am. Prob. Rep. 156: 18 Pac. 6).

9. While evidence of the testator's mental condition and of his acts, conduct and habits, both before and after the time of the execution of the will, is competent, it is only admissible for the purpose of throwing light on the actual condition of the testator's mind at the very time the execution of the will took place, which is the crucial period and the true time to try the testator's mind: *Chrisman* v. *Chrisman*, 16 Or. 127, 138 (6 Am. Prob. Rep. 156: 18 Pac. 6) ; *State* v. *Hansen*, 25 Or. 391, 396 (35 Pac. 976) ; *Von de Veld* v. *Judy*, 143 Mo. 348 (44 S. W. 1117, 1120) ; *Kerr* v. *Lunsford*, 31 W. Va. 659 (2 L. R. A. 668: 8 S. E. 493) ; 16 Am. & Eng. Enc. Law (2 ed.), 614; Abbott, Brief on Facts, 429, par. 14.

10. Ability to transact ordinary business is a more stringent test of testamentary capacity than the law requires. If a testator has capacity to transact ordinary business, the presump-

tion arises that he is capable of doing any act requiring no greater capacity, which would include the act of making a will. But the converse is not true, and a person who is incapable of transacting ordinary business may have sufficient capacity to make a testamentary disposition of his estate: *Waugh* v. *Moan,* 200 Ill. 298 (65 N. E. 713); *Crossan* v. *Crossan,* 169 Mo. 631 (70 S. W. 136, 138); *Perkins* v. *Perkins,* 116 Iowa, 253 (90 N. W. 55, 57).

11. The evidence shows that the testator, George W. Pickett, possessed ample testamentary capacity to execute the will of April 22, 1902. The following cases are illustrative and quite in point: *Heirs of Clark* v. *Ellis,* 9 Or. 128; *Chrisman* v. *Chrisman,* 16 Or. 127 (6 Am. Prob. Rep. 156: 18 Pac. 6); *In re Cline's Will,* 24 Or. 175 (41 Am. St. Rep. 85: 33 Pac. 542); *In re Will of Silverthorn,* 68 Wis. 372 (32 N. W. 287); *Cheney* v. *Price,* 90 Hun, 238 (37 N. Y. Supp. 117); *Von de Veld* v. *Judy,* 143 Mo. 348 (44 S. W. 1117); *Perkins* v. *Perkins,* 116 Iowa, 253 (90 N. W. 55); *O'Connor* v. *Madison,* 98 Mich. 183 (57 N. W. 105); *Van Riper* v. *Van Riper* (N. J.), 59 Atl. 244; *Woodman* v. *Illinois T. & Sav. Bank,* 211 Ill. 578 (71 N. E. 1099).

12. To invalidate a will on the ground of fraud, coercion or undue influence it is not sufficient to show that the person deriving benefit or advantage under the will had the motive and opportunity to exercise such fraud, coercion or undue influence; there must be evidence that he actually exercised it and controled the actions of the testator to such an extent that the instrument is not his free and voluntary act: *Hubbard* v. *Hubbard,* 7 Or. 43, 47; *Holman's Will,* 42 Or. 345, 358, 362 (8 Prob. Rep. Ann. 336: 70 Pac. 908); *Goodbar* v. *Lidikey,* 136 Ind. 1 (35 N. E. 691, 692: 43 Am. St. Rep. 297, 299).

Opinion by MR. COMMISSIONER SLATER.

We shall discuss and determine the issues in the order hereinbefore set forth.

Was the will legally executed? It appears from the testimony that Pickett for some years prior to the 22d day of April, 1902,

the day on which the will was executed, had been afflicted with
an arterial disease, technically known as arterio sclerosis, from
the effects of which he had become almost, if not entirely, blind
at the time the will was executed, and had become afflicted with
an impediment in his speech. The will was prepared by George
B. Dorris, an attorney of long experience and excellent standing
at the bar of Lane County, two or three days prior to the 22d
day of April, 1902, and, in response to a notice from him that
the will was ready for execution, the decedent on that day came
to Dorris's office in the City of Eugene, accompanied by Charles
A. Davis, who was his regular attendant, but who did not go
into the office with Pickett. According to the testimony of
Dorris, which stands uncontradicted, he then and there read
over the will to decedent, who said it was just as he wanted it.
Dorris and decedent then went to the First National Bank of
that city to procure witnesses to attest the execution thereof.
Having gone into the directors' room—a small room in the rear
of the bank—Dorris called into the room P. E. Snodgrass and
F. N. McAllister, who at that time were employees of the bank,
and in the immediate presence of decedent, and in an audible
tone of voice, so that decedent could hear him, Dorris said to
Snodgrass and McAllister, "Mr. Pickett wants you to witness
his will." Dorris then took the will out of his pocket, placed
it on the table and asked Pickett, "Has the will been read to
you?" and he answered, "It has." Dorris then asked him, "Is
it as you want it?" He answered, "It is as I want it." Pickett
had an impediment in his speech and emphasized the words "as
I want it." They were spoken louder than the other words.
Dorris then said to Pickett, "Shall I write your name to the
will?" and he replied, "Yes, I can't see to write it myself."
Dorris then wrote the name of decedent at the foot of the will,
following it with a seal, after which he wrote these words: "The
name of Geo. W. Pickett written by Geo. B. Dorris, at his re-
quest and in his presence and the presence of the subscribing
witnesses hereto." Immediately following these words, Snod-
grass, McAllister and Dorris subscribed their names and places

of residence. Dorris, on the witness stand, identified the will, and the name of George W. Pickett written by himself, and the signatures of the two witnesses together with his own.

F. N. McAllister testifies that he had been acquainted with Pickett about five years, whom he saw quite often in the bank where witness was bookkeeper, Pickett having an account with the bank; that witness and P. E. Snodgrass were in the room when Dorris asked Pickett if that was his will and he said it was; that Dorris asked him if it had been read to him, and he said that it had, and that it was just as he wanted it. McAllister could not remember whether Dorris asked Pickett if he should sign his (Pickett's) name, or not, but he knew Pickett was blind, and not able to write his name, and he was feeble at the time. Nor could witness say whether Pickett told Dorris to write his name or not; but he does say that Dorris wrote Pickett's name to the will in the presence of Snodgrass and himself, and that he signed his name to the will as a witness in the presence of both Dorris and Snodgrass. After the witnesses had come into the room, it was stated to them by Dorris for what they were wanted, and McAllister says:

"I knew the character of the instrument. I thought Mr. Pickett knew what he was doing. He seemed very feeble and I could see he was blind. He seemed to answer all the questions intelligently."

This witness identifies his signature to the formal proof of the will which he says was made a short time after the death of Pickett. On cross-examination, he testified that he had no occasion to speak to Pickett while in the room, but he thought Pickett knew that he was to witness the will, and that he signed his name to the will at Dorris's request to witness his (Dorris's) act in signing Pickett's name, and that Pickett seemed to assent to everything done at that time; that Pickett did not know witness was in the room, so far as seeing him was concerned, nor did he know what paper was being signed for him, so far as seeing was concerned, nor could he have known what paper was being signed, except what some one told him, and there was

no discussion about the provisions of this instrument, the contents of it or details of it. Nothing whatever was said about this paper except that it was his will.

P. E. Snodgrass, the other witness to the will, testifies that he was cashier of the bank, and that he had known Pickett for 10 or 12 years prior to the 22d day of April, 1902. His acquaintance with Pickett grew out of the latter's business relations with the bank. For a number of years Pickett could not write his name very well and his eyesight was bad, and for some time Pickett's name had been signed for him by others to checks when he wished to draw money out of the bank. Witness identifies his own signature to the will, and to the formal proof of the will, and states that he was requested by George B. Dorris, in Pickett's presence, to act as a witness to the execution of his will. · What occurred at that time is more particularly stated by the witness in his own language as follows:

"When I was first called, I do not remember the exact words spoken by Mr. Dorris, but I knew from what he said that he wanted us to witness this will. He wanted one other witness there, some one to witness with me the signing of the will. When we went into the rear office to the table, I do not know just the words that was used, but he made it plain to me that he had written Mr. Pickett's will, and he wanted us to witness that, Mr. McAllister and myself—there was four of us in the room. Mr. Pickett attempted to talk and tell us something about what it was, but he seemed to be unable to express himself, that is, he did not talk plainly. There seemed to be rather an impediment in his speech more than anything else. Mr. Dorris asked the question of him, if that was his will, and if it had been read to him, and if the contents were what he wanted; and, if I remember right, Mr. Dorris read to us that part setting forth the fact that he, at the request of George W. Pickett, was signing his name to the will, and then he signed it, and Mr. McAllister and I witnessed it. That part I remember, his reading that part stated there; that Mr. Dorris signed it at the request of Mr. Pickett, and Mr. Pickett assented that the will ·had been read to him, and that Mr. Dorris was to sign it at his request. * * Pickett attempted to speak, but he had this impediment in his speech, so that he was not able to say 'yes' or 'no' readily to questions, but he assented so I understood that he

knew what he was attempting to do. He assented to the questions.

Q. In what tone of voice did Mr. Dorris ask those questions of Mr. Pickett?

A. I think in the usual tone of voice that one would address to a person when close to them. * *

Q. Were they audible to yourself?

A. Yes, sir. * *

Q. When did you and Mr. McAllister sign as witnesses with reference to Mr. Dorris's signing Mr. Pickett's name to the will, before or afterwards?

A. We signed it afterwards, immediately after he signed the will.

Q. Did you witness the signing of the signature by Mr. Dorris as a witness also?

A. I do not remember that Mr. Dorris signed as a witness. If he signed it, I do not remember that.

Q. Did you remain in the room until the execution was completed?

A. Yes, sir.

Q. Did all four of you remain in the room until the execution was completed?

A. Yes, sir.

Q. Signed and witnessed?

A. Yes, sir.

Q. Was Mr. Pickett aware of your presence there as a witness?

A. I think he certainly was.

Q. Was Mr. Pickett with Mr. Dorris when he first requested you to come in and sign as a witness?

A. Yes, sir. Standing within a few feet of him, three, four or five feet.

Q. At the time of the execution of the will, where were you all standing with reference to each other in the directors' room?

A. We have a table in the office, about the size of this one (referring to the table used by the reporter). We were all up immediately around that table."

The witness identified his signature to the formal proof of the will made after Pickett's death, and the will itself was

offered and admitted in evidence, to the admission of which the contestants objected, on the ground that it was not shown that the will was legally executed and attested, and it was not shown that the paper alleged to be the will of George W. Pickett was his will, or that the execution thereof was his voluntary act. On cross-examination, said witness stated that at the time of the execution of the will in the directors' room, the contents thereof was not read or discussed, and that he knew nothing about its contents; but that Dorris did read the statement at the foot of the will to the effect that, at the request of Pickett, Dorris signed his name to the will; that he heard that matter discussed, and that Pickett did not personally request witness to sign the will as a witness.

"Q. Did he at any time say anything to you about signing as a witness to the will?

A. No; I could not say that he did. He attempted to talk to us. The way I remember it is this: He having this slight impediment in his speech, Mr. Dorris assisted him by asking him the question, that he wanted us to sign the will, and if it was his will, and if it had been read to him, and he assented to it, so that it was clear in my mind that that was what he wanted with us, to sign the will as witnesses; and he came in there for that purpose."

1. The foregoing is, we believe, a fair summary of the material testimony offered in proof of the legal execution of the will. This evidence was not controverted; but it is contended by counsel for contestants that Dorris is disqualified under our statutes from being a subscribing witness to the will, and from testifying in support thereof, because he has an appointment in the will as attorney for the executor, and has been acting as such attorney, although by his answer he renounces all benefits under the will. The provision of the will referred to by counsel is as follows:

"I appoint Geo. B. Dorris, attorney at law, to assist the executor in settling my estate."

The statute to which counsel refer is doubtless Section 5564, B. & C. Comp., which, so far as it is applicable, is as follows:

"If any person has attested or shall attest the execution of any will, to whom any beneficial * * appointment of or affecting any real or personal estate * * shall be thereby given or made, such * * appointment shall, so far only as concerns such person attesting the execution of such, or any person claiming under him, be void; and such person shall be admitted as a witness to the execution of such will."

The provision of the will above referred to cannot be construed as giving or making to Dorris "any beneficial * * appointment of or affecting any real or personal estate," nor can it be construed to be anything more than an advisory provision, which the executor may follow or disregard according to his own judgment. It confers no rights upon the appointee: *Young* v. *Alexander*, 16 Lea, 108.

2. The fact that Dorris is acting as an attorney for the executor in the settlement of the estate, and in this contest, is of no consequence; for he could not do so without the executor's consent and employment of him, and to him Dorris must look for his fees. The appointment of an attorney is personal to an administrator or executor: *Waite* v. *Willis*, 42 Or. 288 (70 Pac. 1034).

3. Counsel for contestants urge that, Pickett being blind, and, as they contend, quite deaf, and unable to speak, proof of the ordinary signing and execution of the will in the mode prescribed by the statute, is not sufficient to establish the fact that the instrument offered for probate contains the will of the testator. It was admitted by the proponents of the will that Pickett was blind, but it was denied that he was deaf or hard of hearing or could not speak, and the evidence hereinbefore quoted and referred to shows beyond any doubt that Pickett, at the time of the execution of the will, could and did hear ordinary conversation carried on by those in his immediate presence; that he understood what was being said by others; and that, with some effort, he made intelligent replies to questions then put to him by his attorney.

Under this state of the record, the contention of counsel for contestants as to the law applicable to this question is based

upon a false premise, excepting in so far as it is conceded that Pickett was blind. He was, through his sense of hearing, conscious of the presence in the room of the two persons who were to act as witnesses to his will, and of the purpose for which they were there, and of what was being done there at that time by them in his behalf. No other conclusion can be correctly derived from this testimony. Being conscious of what was being said and done at that time in reference to the execution of the will, and making no objection, the acts of said Dorris and said witnesses have the same effect in law as if done by his express request. "If such third person acts truly for the testator, in his conscious presence and with his apparent consent, the legal effect is the same as though the testator himself had spoken and directed the business": Schouler, Wills (2 ed.), § 329. This authority is cited with approval by Mr. Justice Moore, in *Ames' Will*, 40 Or. 495 (7 Prob. Rep. Ann. 536: 67 Pac. 737). It was stated in Pickett's hearing that those two persons were to act as witnesses to his will. They were requested by his attorney, in his presence, to act in that capacity. At the same time he was asked by his attorney if the will had been read to him, and he said it had; if it was as he wanted it, and he said it was; and "Shall I write your name to the will?" to which he replied, "Yes, I cannot see to write it myself." While McAllister cannot say that Dorris asked him that question, or whether Pickett told Dorris to sign his (Pickett's) name, yet Snodgrass does remember, and is emphatic in the statement that just before Dorris signed Pickett's name to the will he (Dorris) read the statement that by the request of Pickett he signed his name to the will, and that he (witness) heard that matter discussed. Section 5548, B. & C. Comp., provides that every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator. And Section 5549 provides that every person who shall sign the testator's name to any will by his direction shall subscribe

his own name as a witness to such will, and state that he subscribed the testator's name at his request. The testimony heretofore adverted to not having been controverted, it must be admitted as conclusively establishing the fact that all the requirements of the statute respecting the execution of a will were fully complied with, and that it was legally executed.

4. Did the testator possess testamentary capacity? It is the main contention of counsel for contestants that he did not. In this connection they urge that the burden is upon proponents to establish the fact of testamentary capacity by a preponderance of the testimony, as well as the fact that the mind of the testator accompanied the act of execution, thereby making the instrument his will. They also urge that, when a testator is blind or unable to speak, and his mind is impaired, the ordinary subscription and execution of a will in the mode prescribed by the statute are not sufficient to raise the presumption of the competency of the testator, and that it contains his unrestrained wishes in the disposition of his property; but, to produce that result, the will must be read in the presence of the subscribing witnesses. Mr. Justice Wolverton, in *Holman's Will,* 42 Or. 345, 357 (8 Prob. Rep. Ann. 336: 70 Pac. 908, 913), says: "The burden of proof, in the probate of the will rests with the proponent, as it relates to the due and regular execution, the testamentary capacity of the testator, and his voluntary act, free from the domination of fraud, undue influence or coercion. This is the doctrine announced in *Hubbard* v. *Hubbard,* 7 Or. 42, and, in principle, has been reaffirmed in the Chrisman Case: 16 Or. 127 (18 Pac. 6). In the latter case, the only ground for contest was as to the testamentary capacity of the testator; but it is just as essential to show that the will was not superinduced by fraud, deceit or undue influence, to make it his act and will, as it is to establish a disposing mentality. It must be the 'last will,' says Baron Parke, in *Barry* v. *Butlin,* 1 Curt. Ecc. 637, 'of a free and capable testator.' It is said in *Greenwood* v. *Cline,* 7 Or. 17, that 'where a will is shown to have been duly executed, the law presumes competency in the testator,

and that it contains his unrestrained wishes in the disposition of his property.' The presumption is a disputable one, however, and may be overcome or refuted by other proofs. It is, notwithstanding, sufficient *prima facie* to establish the will, but it does not shift the burden of proof. That rests from first to last with the proponent, and, if he would prevail, he must have the stronger case in the end."

Mr. Redfield, in his work on Wills (volume I, 4 ed., § 57), says: "The statute does not require a will to be read to the testator, in the presence of witnesses; but it is proper to do so, although not absolutely indispensable, when the testator is blind, or cannot read. Besides the mere formal proof of execution, which is required in all cases, something more seems necessary to establish in the most satisfactory manner the validity of a will, when, from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from the formal execution. Additional evidence is required that his mind accompanied the will, and that he was cognizant of its provisions. This may be established by the subscribing witnesses, or other proof. It is not absolutely required in the proof of wills executed by blind persons that the witnesses should be able to depose that the testator was cognizant of the contents of the paper which he declares to be his will and desires the witness to attest. This has been so ruled in the cases already cited. And the same rule applies to persons deaf and dumb, as well as blind. The rule laid down by Swinburne (part 2, § 11, pl. 1, citing a long list of civil law and continental writers to the point), in regard to the formalities requisite to the validity of wills made by blind persons, seems altogether reasonable: 'He cannot make his testament in writing, unless the same be read before witnesses, and in their presence acknowledged by the testator for his last will. And, therefore, if a writing were delivered to the testator, and he, not hearing the same read, acknowledged the same for his will, this were not sufficient; for it may be that if he should hear the same he would not own it.'

But, as we have before seen, this rule has been very much relaxed, both in England and America, and we see no reason for requiring positive evidence of the will being read to a testator who is blind, in the presence of the witnesses; since it has been decided that where a will is drawn up in the presence of the testator, and signed by him, although not read to or by him, if properly executed and witnessed, it becomes a valid testament, upon proof that it was in fact drawn up according to the testator's instructions. But upon principle, we should have regarded both of the foregoing propositions not maintainable upon unquestionable authority, and practically are more convenient than a more strict construction": *Martin* v. *Mitchell,* 28 Ga. 382; *Wampler* v. *Wampler,* 9 Md. 540; *Hess' Appeal,* 43 Pa. 73 (82 Am. Dec. 551); *Hempill* v. *Hempill,* 13 N. C. 291 (21 Am. Dec. 331). But proponents in this case are not reduced to the extremity of having to rely upon merely a *prima facie* case, consisting only of presumptions arising from the formal execution of the instrument in accordance with the terms of the statute. The evidence shows conclusively that the will was read over to the testator by his trusted attorney on the same day, and shortly before its execution, and that the terms of the will are in conformity with the wishes of the testator, as expressed by him to his attorney some time before that; that after the reading of the will the testator said it was as he wanted it, and, finally, and immediately preceding the execution thereof, he expressed assent that the will was as he wanted it.

5. So, then, the sole question to be determined is the mental capacity of the testator at that time, that is, his testamentary capacity. To determine this question, we are obliged again to refer to the evidence in addition to that already set forth; but, owing to the voluminous character of the testimony, it will be impossible to do more than refer to the salient features of it. It appears from the testimony that on January 10, 1902, decedent came to Dorris's office and employed him to do his writing for him, look after his bank account and checks and see that they were right, saying that his eyesight was failing him, but

that he could collect his own rents. He paid Dorris at that
time for one year's services and took a receipt which was after-
wards found among decedent's papers, and is in evidence. On
January 27, 1902, he had Dorris send a telegram to Dallas,
Tex., to Mrs. Agnes Joyce, his sister, and one of the respond-
ents herein, to come to Eugene at his expense, that he was in
poor health. At that time he mentioned to Dorris that he
might want a will drawn if he found it necessary; but he did
not know that it was necessary because his sister, Agnes Joyce,
was his only living relative so far as he then knew. Dorris, on
learning from deceased that he had brothers and sisters from
whom he had not heard for 30 or 40 years, and that he did not
know whether they were living or dead, advised him that if any
of them were living, or if they had died leaving children, they
would share his estate equally with Agnes Joyce, to which
Pickett said, "I don't want it that way." And he then stated
further to the effect that he intended to give his sister the
Eugene property and that he wanted his Junction City property
to pay his funeral expenses, build a monument, and give his
niece, Katie White, $1,000. At this time Dorris took down the
names of all of decedent's brothers and sisters, as given to him
by decedent. Mrs. Agnes Joyce, in response to her brother's
telegram, arrived in Eugene February 4, and remained until
March 4, during which time she lived in decedent's building
with him, and looked after him, seeing him every day, and took
her meals with him at the Hoffman House.

During this time decedent was nearly blind and could not
see to get around very well. He talked with his sister on cur-
rent topics and events, and was interested in the ordinary sub-
jects of conversation, having the papers read to him every day.
About February 8 or 9, he told his sister that she was his only
living heir, and that if she should outlive him his property would
go to her; but that he was going to make a will, as he wanted
to give something outside. Nothing was said between Agnes
Joyce and Dorris about the will. About March 12, Pickett
had Dorris procure for him a transfer of $2,000 which decedent

had in the bank at Junction City, to a bank in Eugene. On the 15th of March, decedent had Dorris procure exchange on New York for $1,000 in favor of Alice Joyce; being the same person as Agnes Joyce, which he caused to be sent to her at Dallas, Texas, as a gift. About the 14th of March, decedent became quite sick, and for at least one or two nights he was delirious, and at different times during that month, usually in the late afternoon or evening, he was out of his head; but during the morning and forenoon of each day he was in his normal condition of mind. About the last of March, Mrs. Joyce received a telegram at her home in Dallas, Texas, from Mrs. Hoffman of Eugene, saying that decedent was worse, and she returned to Eugene, arriving March 30. She found that her brother had been very ill, but was then much better. He knew her, and seemed to be all right, as she testified. From that time she was with decedent during the daytime whenever he was in his room, and his nephew, John Colvin, was with him at night. Charles Davis was with him during the daytime from February 19 until May 4, when decedent discharged him, and hired Colvin because he could get the latter for $1.25 per day, whereas he had been paying Davis $2 per day. Decedent was out of the house a good deal during the daytime, walking to procure exercise, and during such time he was always accompanied by Davis or Colvin. He said nothing to his sister after she came back about the property. She testifies that he was better during April, except one evening about the 20th or 21st, when he got mad and his mind was not clear.

The testimony on the part of the proponents shows that prior to and for some time after the making of the will, decedent collected his rents, paid his own personal expense bills, including the wages of his attendant; but when it was necessary to draw a check, others assisted him by signing his name, as when he paid his taxes to the sheriff some time in March. Davis testifies that for quite a while decedent's mind was apparently as good as it ever had been, and that during the months of March and April his mind was in the same condition it always had

been. About April 12, 1902, Pickett again came to Dorris's office, and asked him to make his will, and, in the conversation they then had, they referred back to what had been said on that subject in the previous conversations, and at that time Pickett gave Dorris information as to the character of his property, being a business block in Eugene, which he valued at $20,000, two-sevenths of the stock in the Junction City Bank with the building, and some money in the bank. Pickett supposed the stock and the money he had in the bank would perhaps be about $5,000. He then directed Dorris to include in his will $250 for each of decedent's brothers and sisters, if they were living, but if they were dead that such sum should go to the children of each of them, if any. Decedent at this time asked Dorris if a brother and all of his children were dead, what would become of the money given to such brother in the will. Dorris told him that it would go to the decedent's sister; she being the residuary legatee. Decedent directed Dorris to put into his will $1,000 for his niece Katie White, and to provide for the payment of his funeral expenses, and for a monument. A few days thereafter, after consultation with Dorris, decedent directed him to name S. B. Eakin as executor, and Dorris suggested that, as decedent had no relatives living at Eugene, he had better make provision for the care of his grave, which he did by directing Dorris to leave $100 in trust to the Masonic lodge for that purpose. Before drawing the will, and while Agnes Joyce was in Eugene on her first visit, Dorris asked her for the names of all her brothers and sisters, but said nothing to her about a will, or for what purpose he desired the information. She gave him the names, and they corresponded with those given to him by the decedent.

From the time Dorris commenced doing business for decedent, decedent's mental condition was good, so far as knowing his own business was concerned. He knew what property he possessed, and seemed to know how to take care of it. And, in conversation with him, Pickett showed more than ordinary intelligence with reference to business transactions. Dorris testified that he

used no persuasion or influence, and made no suggestions to him as to how to make his will or any part of it, excepting he suggested to Pickett the trust fund of $100 to provide for caring for his (decedent's) grave; that no one ever spoke to him about this will; that he always knew Pickett had the Eugene property, and he learned from Pickett concerning all his other property; that he knew nothing about Pickett's family, except what he learned from Pickett himself and Mrs. Joyce; that no other person was present when the contents of the will were talked about between himself and decedent, and no other person but himself knew anything about the contents of the will prior to when it was opened after decedent's death. Soon after having made the will, decedent spoke of the matter to Davis, his attendant, and also to his sister, merely saying he had made a will, but nothing as to its purport or contents. Numerous acts of attention to matters of private business by decedent occurred during the months of April and May, all tending to show more or less cogently his mental capacity properly to attend to such matters, the most striking of which is, perhaps, his discharge of Davis as his attendant on May 4 and his employment of Colvin to serve in that capacity, in order to save the difference between $2 per day, which he had formerly paid Davis, and $1.25, which he afterwards paid Colvin, which acts are cited to show his mental status.

To meet this testimony on the part of proponents, the contestants offered several witnesses, who testified to irrational acts of decedent on the night of March 14, 1902, when he had been acting in a wild and strange manner, indicating that at that time he was more or less mentally deranged, and that this condition continued for several days thereafter. Five or six different persons, who had known decedent, and had recently been upon terms of intimate friendship with him, testified to his inability and failure to recognize them when they happened to meet on the street, although particular pains were taken at the time to inform him as to the identity of the persons talking to him, and incidents of their former associations and acquaintance were recalled to

him; but decedent stated that he did not know such persons. One instance of this character is stated to have occurred as early as March 2, 1902, but the time of the occurrence of the majority of them is not precisely fixed, and evidently most of them occurred after the will was executed. Both Davis and Colvin, witnesses for proponents, and who had been his attendants, deny that any such things ever happened.

The main reliance of contestants to prove the want of mental capacity of the decedent is upon the evidence of Dr. T. W. Harris, who attended upon decedent during the latter's illness. He called upon decedent on February 1, 1902, when he treated him for a cutaneous eruption, but the underlying cause of his trouble was arterio sclerosis, or hardening of the blood vessels. It is occasioned by a deposit of fibroid tissues in the walls of the blood vessels whereby the blood vessel loses its elasticity, and at the same time is narrowed so that the smaller blood vessels or arteries sometimes become so small that they carry no blood at all, and consequently the several organs of the body are deprived of the necessary amount of sustenance to maintain them in their usual vigor. In this case the artery supplying the brain and particularly the region of the optic nerve, first became seriously affected, and for that reason he lost his eyesight. Dr. Harris saw him from time to time, but not continuously. He called to see him some time in the latter part of March, when he seemed to be very much excited. His condition at that time was characteristic of cases of that kind. Conditions of excitement or distress, particularly an attack of indigestion, would excite and aggravate the mental condition very much. Decedent was inclined to have acute indigestion, and occasionally he had attacks which would greatly excite his mental condition. At those particular times he would become mentally unbalanced. In a day or two the digestive condition would be corrected, and his mental condition would clear up and become more nearly normal as compared with his condition when excited by indigestion. Pickett's case was progressive from the time the witness first saw him, and there was a gradual diminution of mental capacity

and strength, which could not probably be noticed by comparing one day with another, but could be by comparing several days together. Witness was not able to state specifically what Pickett's mental and physical condition was on April 22, 1902, the date of the will; nor could he say that he was enjoying relief from any excitement at that time.

Dr. Harris gives the following opinion of decedent's general mental capacity and physical condition during the time he attended him:

"As to his capacity to make a will on April 22, I believe that, if the property consisted of all money or real estate, in one simple piece of property, say a block, and if the beneficiaries were one, two or three, between whom this property should be divided equally, I believe that it would have been possible for Mr. Pickett at that time to have made such a distribution. Where, however, on the other hand, if the property consisted of money, notes and accounts, and realty and personal property, and the beneficiaries were numerous, and the distribution made unequal, I do not believe he could have taken this up and initiated it at that time, and have made the distribution intelligently, for the reason that he could not sustain a mental effort long enough to do it. If he had formulated this prior to this time and fully fixed it in his mind, just what he wanted to do, and what he intended to do, it would have been possible probably for him to have made that distribution. * * From the time I was called to see him, I do not think there was a day from the time I saw him he would have been able to initiate the matter, putting the property on one side, and the beneficiaries on the other side, between whom he was to make an unequal distribution. * * The final result of his trouble was a complete loss of mind, total inability to command himself in any way, loss of the use of muscular co-ordination. He could not co-ordinate or command the group of muscles to the accomplishment of a definite object. * * It was sometimes difficult for him to talk for that reason, he could not co-ordinate the muscles of articulation. * * He became totally unconscious only a short time before his death. * * Sometimes he would apparently be rational; then, speak to him sharply, he might recognize a name; do that, and he would probably answer a question or two rationally, and he would relapse into a condition of delirium. * * Well, there was only one particular thing, one dominant characteristic,

about Mr. Pickett, and that was a kind of stubbornness. He was peculiar in that respect. He liked to antagonize, liked to oppose; you state that a certain thing was so, he liked to say it was not so. That is one peculiar characteristic that continued for a long time, but, outside of that, he did not have the mental strength he formerly had. * * There were several times when he was in that condition of mania, and the first manifestation of that that he had at all was in a mild way. * * Some time about the 20th to the 24th of March—somewhere along there. * * This was brought about by associated conditions, particularly the indigestion. * * He had not had any that I could ascertain of that kind prior to that time. * * Mr. Pickett was better of mornings, * * his mind would be clearer and stronger for a time than in the evening, because the general wear and tear of the day would always wear his mind out so that of an evening he would not be able to think very much. * *

So far as he thought, he thought accurately; but the facts in the case are he was not able to think strongly or for any length of time. * * There was no time that he would not recognize me, or recognize one coming into the room. Sometimes he would not recognize me at all until I had talked with him some little time, and when I would tell him who I was, he would recognize me. * * I made visits in April on the 23d and 28th. Have no recollection concerning the visit on the 23d; nothing about it that impressed me more than any other visit. He did not lose his characteristic of stubbornness until some time in September. In February, March and April he was pretty stubborn; he still had that peculiar characteristic. * * If he had the matter thoroughly in mind before the will was made that he had made up his mind as to what he was going to do, or what he intended to do, I do not think anybody could move him at all. If he had taken up the matter at that time, negotiated the matter at that time, he would attempt to carry it out. * * He was rather inclined to be irritable at best. * * He had indigestion and dyspepsia pretty badly. * * I was not called to see him in March or April when he was acting strangely, except on the occasion of the spell during the latter part of March. That was the first I had knowledge of. He was then somewhat delirious. The trouble was owing to the condition of his digestive organs. During that spell I saw him during the day and evening, too. I found him considerably agitated. He talked and kept walking all the time, and you could not do anything with him. * * A person with arterio sclerosis can

think correctly so far as he is able to think, and finally when the blood vessels become so hard as to prevent the blood going through, the mind is unable to work at all, delirium ensues, and finally death. * * That was the history of Pickett's case. He could think to a certain extent until the flow of blood was cut off entirely. * * He responded to the tendon reflex test. An insane man ordinarily fails to respond to that, but it depends on what part of the brain is affected. * * I have no specific recollection as to his condition on April 22."

The rule is well settled in this state that, if at the time a person executes his will, he understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses testamentary capacity, notwithstanding his old age, sickness, inability of body or extreme distress (*Ames' Will,* 40 Or. 495 (7 Prob. Rep. Ann. 536: 67 Pac. 737), and the mental capacity of the testator is to be tested as of the date of the execution of the will, and, other things being equal, the evidence of the attesting witnesses, and, next to them, of those present at the execution, is to be most relied upon: *Heirs of Clark* v. *Ellis,* 9 Or. 128; *Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6). Evidence, however, of the testator's mental condition, of his acts, conduct, habits, both before and after the execution of the will, is admissible, but only for the purpose of throwing light on, and, so far as it tends to indicate, the actual condition of the testator's mind at the time of the execution of the will, which is the crucial period: *Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6) ; *Carnagie* v. *Diven,* 31 Or. 366 (49 Pac. 891). There is no direct evidence in the record of what the mental capacity of the testator was on the 22d day of April, 1902, other than that offered by proponents, which is included in the testimony of Dorris, who prepared the will, and of McAllister and Snodgrass, all whom were present at the time, and were witnesses to the execution of the will. Each of these parties, and especially Dorris, had previously had more or less business dealings with the testator, when he was unquestionably in a normal mental condition, and they were thus in a position

to judge by comparison more accurately than others as to the testator's mental capacity at that time. None of them observed in Pickett's actions at that time anything to indicate that he was not competent to execute the will. They saw nothing unusual about him at that time. The most impressive fact, perhaps, in this case, is that on January 27, 1902, the testator gave to Dorris the names of all his brothers and sisters, and then in general terms stated his wishes as to the manner of disposing of his property, namely, that he intended to give his Eugene property, valued by him at $20,000, to his sister, Mrs. Agnes Joyce, and wanted his Junction City property, valued by him at $5,000, to pay his funeral expenses, build a monument, and give his niece, Katie White, $1,000. That is the time that he initiated the making of his will, and that was before his sister had arrived in Eugene, and hence it could not have been the result of any influence exercised by her. It certainly was the product of his own mind and wishes uninfluenced by any one.

It is conceded by counsel for contestants in their brief, in effect, that during the month of January, at least, Pickett had testamentary capacity; and his will, as finally made, is substantially in conformity with testator's original wishes expressed in that month. The specific bequest of $250 to each brother and sister, other than Agnes Joyce, and the addition of the trust fund of $100 to the lodge, are fully explained by the advice of his attorney. And the bequests of $500 each to Henry Hoffman and Helen Hoffman are the only other changes from his expressed original intention. The value of the Junction City property is amply sufficient to cover all of these special bequests, including $1,000 to Katie White; so that Agnes Joyce, the sister, will in fact receive by the terms of the will the identical property which the decedent in his mind set aside for her on January 27, 1902. But, passing over the other incidents of the case, we find that on April 12, only 10 days before the will was executed, he stated to his attorney what property he owned, and again discussed with him the terms of his will, directing his attorney how much to give to each of his brothers and sis-

ters, how much to Katie White, and, at the same time, directed Dorris to include $500 each for Henry Hoffman and Helen Hoffman.

Opposed to this theory of the case, we find the claim made by the contestants of the mental unsoundness of the testator, based upon the opinion evidence of the attending physician, Dr. Harris. The diagnosis of Dr. Harris is not questioned by proponents, nor do they dissent from his description of the nature and character of his disease, or his statement of its gradual progressive character and ultimate effect upon the system. His description of the effect of the disease upon Pickett's mind, and of his mental capacity during the time he attended him professionally, impresses us with the conviction that Pickett was not insane, but that his brain, being deprived of the necessary flow of arterial blood, became starved and perhaps was not capable of any very great or prolonged mental effort. In fact, Dr. Harris says that, so far as he thought, he thought accurately, and that he could think to a certain extent until the flow was cut off. Dr. Harris called upon decedent only twice during the month of April, one of which times was on April 23, but he cannot recall what the condition of his patient was at that time. He gives his opinion, however, that if the property consisted all of money or all real estate in one simple piece of property, and if the beneficiaries were few, between whom this property was to be divided equally, it would have been possible for him at that time to have made such a disposition; but, if the property consisted of money, notes and accounts, and of real and personal property, and the beneficiaries were numerous and the distribution unequal, he did not believe decedent could have taken up and initiated it at that time, and made distribution intelligently, for the reason that he could not sustain a mental effort long enough to do it. He qualifies his opinion, however, by saying, that "if he had formulated this prior to this time, and fully fixed it in his mind just what he wanted to do, and what he intended to do, it would have been possible probably for him to have made that distribution." "I do not think there was a

day," he says, "from the time I (first) saw him he would have been able to initiate the matter, putting the property on one side, and the beneficiaries on the other."

At the utmost, this is but opinion evidence, which may or may not be correct, but it cannot be permitted to overcome the unqualified statements of an unimpeached witness of the existence of the very fact that the opinion says is impossible. We have here an opinion set up against a statement of a fact. Measured by the rule hereinbefore given for ascertaining the testamentary capacity of decedent, the uncontradicted testimony of Dorris, that within the time set down in the opinion evidence of Dr. Harris the testator did give to him a statement of what property he was possessed, and the names of the persons to whom he wished it to go, is conclusive that decedent was possessed of testamentary capacity at the time of the execution of the will. But we do not regard this opinion of Dr. Harris as being necessarily against the validity of this will on the ground of the want of testamentary capacity, but rather supports it. The opinion admits Pickett's mental capacity to make at least a simple will at the time he made the will in question, and even admits his ability to make a more complicated one, if he had formulated it prior to that time, and had fully fixed in his mind just what he wanted to do and what he intended to do. This is in fact what Pickett did, as shown by the uncontradicted testimony. Without further commenting upon other features of the testimony, it is sufficient to state that we are fully convinced that no other conclusion can be correctly derived from the whole record than that at the time the will was executed, the testator was possessed of testamentary capacity.

6. Was the testator subjected to undue influence? This question need not be considered at any great length. Mr. Justice Wolverton, in *Holman's Will*, 42 Or. 345, 358 (8 Prob. Rep. Ann. 336 : 70 Pac. 913), declares the rule to be that, "the fraud, force or undue influence that will suffice to set aside a will must be such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purposes of another

instead, and must be the efficient cause, without which the obnoxious disposition would not have been made. This may be accomplished, not alone by physical coercion, or threats of personal harm or abuse, but also by the insidious operation of a stronger mind upon one weakened and impaired by disease or otherwise, whereby the latter is subjected to the former, and induced to do its bidding, instead of acting in the exercise of unconstrained volition or judgment. It is not all influence brought to bear upon the mind of the testator in the disposition of his property that may be denominated undue." Recalling the statements of Dr. Harris, that Pickett had a positive and dominant element of stubbornness in his character; that he did not lose that until in September; and that, if Pickett had the matter thoroughly in mind at the time the will was made, and had made up his mind as to what he wanted or intended to do, he did not think anybody could move him from his opinion; that if Pickett had taken up and initiated the matter at the time, witness thought Pickett would attempt to carry it out. There is much other testimony in the record to corroborate Dr. Harris's statements in this regard, and they concur with our own views of decedent's character. On the other hand, there is no direct evidence whatever that any one used or attempted to use any undue influence upon decedent to bring about the framing of this will as it now appears. Having found that Pickett initiated the making of his will on January 27, 1902, and before he came into personal contact with Agnes Joyce, the chief beneficiary, and against whom the greatest objection is made by contestants, and having also determined that the will as made is substantially in accordance with his original intention, it must necessarily follow that he was not unduly influenced by any one in the making of such will, and that it is the product of his unconstrained volition and judgment.

7. For these reasons, the decree of the circuit court should be affirmed, with judgment for costs on this appeal against the contestants.                    AFFIRMED.

MR. JUSTICE EAKIN, being a brother of the respondent S. B. Eakin, took no part herein.